UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

UNITED STATES OF AMERICA          CASE NO:    6:25-MJ-00153
                                                           6:25-CR-00227-CBW-1
VERSUS

                                                 MAGISTRATE JUDGE WHITEHURST
MATTHEW REARDON

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS THE BILL OF INFORMATION

NOW INTO COURT, through the undersigned counsel, comes Defendant
Matthew Reardon, who respectfully moves this Court pursuant to Federal Rule of
Criminal Procedure 12(b)(3)(B) to dismiss the Bill of Information filed against him.
Mr. Reardon's motion is based on the grounds that the charged conduct constitutes
protected expression under the First Amendment to the United States Constitution,
that the prosecution seeks to punish his exercise of fundamental rights of free speech,
press, and petition for redress of grievances, and that 41 C.F.R. § 102-74.390 is
facially overbroad and unconstitutional as applied to his peaceful journalistic and
protest activities conducted in a traditional public forum. For the reasons set forth in
this memorandum, this Court should dismiss all charges as violative of clearly
established constitutional principles.

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... 2

TABLE OF AUTHORITIES ................................................................... 4

I. INTRODUCTION ............................................................................... 6

II. BACKGROUND ................................................................................ 7

    A. Mr. Reardon's constitutionally protected journalistic activities ................. 7

    B. The marshal's invitation and Mr. Reardon's peaceful compliance .............. 9

    C. Mr. Reardon is arrested despite complying with the marshal's demands
    ................................................................................................... 11

III. LEGAL AUTHORITIES ................................................................. 13

IV. ARGUMENT ................................................................................... 14

    A.   This prosecution violates clearly established Supreme Court precedent
        protecting political protest in traditional public forums ........................... 14

        1.   *Edwards v. South Carolina* and *United States v. Hylton* mandate
            dismissal of the charges ........................................................ 14

        2.   Courthouse steps constitute a traditional public forum entitled to the
            highest level of First Amendment protection ......................................... 16

        3.   Mr. Reardon's conduct involves three forms of constitutionally
            protected expression ............................................................ 17

        4.   Offensive language does not remove First Amendment protection ..... 19

    B.   The prosecution constitutes content-based discrimination requiring
        strict scrutiny ........................................................................... 20

    C.   The "loud or unusual noise or a nuisance" provision violates the First
        Amendment as applied to Mr. Reardon's protected speech ....................... 21

1.    Mr. Reardon's vocal expression constitutes protected political speech ................................................................................ 22

2.    Unconstitutional content-based discrimination in enforcement .......... 23

3.    Unconstitutional vagueness of the noise provision ............................. 24

**D.    The "unreasonably obstructs the usual use of entrances" provision is unconstitutional as applied to Mr. Reardon's camera placement** ............. 25

1.    No actual obstruction occurred ............................................................ 25

2.    Camera placement as protected newsgathering activity .................... 26

3.    Overbreadth of the obstruction provision as applied ........................... 27

4.    Compliance demonstrates absence of intent to obstruct ..................... 27

V. CONCLUSION  ................................................................................ 28

CERTIFICATE OF SERVICE  ................................................................ 29

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                        <u>PAGE</u>

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569
    (1987) ................................................................................................ 27

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ............................................................. 18, 26

*Brown v. State of La.*, 383 U.S. 131 (1966) ................................................ 17-18, 20-21

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ........................................................ 24

*Edwards v. South Carolina*, 372 U.S. 229 (1963) .................................... 14-15, 20, 22

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ....................................................... 18-19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................... 24

*Kolender v. Lawson*, 461 U.S. 352 (1983) .................................................................. 24

*Massachusetts v. Oakes*, 491 U.S. 576 (1989) ........................................................... 27

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ......................................... 23

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .............................................. 18

*Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ....... 21, 27

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ....................... 18, 26-27

*Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357 (1997) ................... 23

*Terminiello v. Chicago*, 337 U.S. 1 (1949) .......................................................... 22-23

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) ................................................ 23

*United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217
    (1967) ................................................................................................ 19

*United States v. Baldwin*, 745 F.3d 1027 (10th Cir. 2014) ....................................... 21

*United States v. Cruikshank*, 92 U.S. 542 (1875) ..................................................... 17

*United States v. Grace*, 461 U.S. 171 (1983) ............................................................ 16-17

*United States v. Hylton*, 710 F.2d 1106 (5th Cir. 1983)....................................... 15-16

*United States v. Lawrence*, 755 Fed. Appx. 703 (9th Cir. 2019) .............................. 21

*United States v. Moriello*, 980 F.3d 924 (4th Cir. 2020) ........................................... 22

*United States v. O'Dwyer*, No. CRIM.10-034, 2010 WL 2606657 (E.D. La. June 24,
    2010), *aff'd*, 443 F. App'x 18 (5th Cir. 2011) ................................................. 20

*United States v. Strong*, 724 F.3d 51 (1st Cir. 2013) ................................................ 21

*United States v. Wasylyshyn*, 979 F.3d 165 (2d Cir. 2020) ................................. 21-22

*United States v. Zagorovskaya*, 628 Fed. Appx. 503 (9th Cir. 2015)........................ 21

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................................ 23

## STATUTES

U.S. CONST. amend. I (First Amendment)...............................................................*passim*

LA. CONST. art. I, § 7 .................................................................................................. 13

LA. CONST. art. I, § 9 .................................................................................................. 13

41 C.F.R. § 102-74.390.............................................................................................*passim*

## I.    INTRODUCTION

This case presents fundamental questions about the scope of First Amendment protection for journalistic activity and political protest conducted in traditional public forums. The government seeks to criminally prosecute investigative journalist Matthew Reardon for peacefully documenting his grievances against federal law enforcement on the steps of a federal courthouse—conduct that falls within the heartland of constitutional protection under binding Supreme Court precedent.

Mr. Reardon's prosecution arose after he discovered through a Freedom of Information Act request that U.S. marshals had placed him under surveillance for engaging in protected journalistic activities. In response to this perceived government overreach, he exercised his constitutional rights by conducting a peaceful protest on courthouse steps, expressing his grievances through both spoken commentary and written signs, while simultaneously documenting the event through livestreaming and recording for his journalism platform, We the People News. Rather than address the legitimate constitutional concerns raised by his protest, the government responded by arresting Mr. Reardon and seizing his journalistic equipment, thereby transforming his exercise of fundamental rights into the predicate for criminal prosecution.

The constitutional defects in this prosecution are multiple and dispositive. *First*, Mr. Reardon's conduct occurred in a traditional public forum entitled to the highest level of First Amendment protection, where the Supreme Court has

consistently prohibited content-based restrictions on peaceful expression. *Second*, the government's enforcement demonstrates impermissible targeting based on the critical content of Mr. Reardon's message about federal law enforcement conduct. *Third*, the regulation's vague standards fail to provide constitutionally adequate notice of what conduct is prohibited when applied to protected speech activities. *Fourth*, the government's interpretation would criminalize core journalistic and protest activities without any showing of actual interference with legitimate government operations.

Under controlling Supreme Court precedent, this prosecution cannot survive constitutional scrutiny and must be dismissed.

## II.    BACKGROUND[1]

### A.    Mr. Reardon's constitutionally protected journalistic activities

Matthew Reardon operates We the People News, an investigative journalism platform that includes a website, blog, and YouTube channel with over 3,000 subscribers documenting events of public concern. On August 25, 2025[2], Mr. Reardon

---

[1] These facts are presented as they are known at the time of this filing and are based upon the discovery provided at this point. The undersigned believes there to be significant outstanding discovery. On September 8, 2025, Mr. Reardon submitted a request for specific discovery to the government seeking audio, video, and written evidence in this case. Mr. Reardon reserves the right to supplement this motion with additional facts and evidence produced in response to his specific discovery request.

[2] Mr. Reardon had previously visited the courthouse before this date and interacted with the court security officers and U.S. marshals concerning his right to protest and record. During a previous visit, Mr. Reardon attempted to file a complaint against the U.S. marshals, but was told by Marshall Farrish to contact Washington D.C. to complain. The instant charge, however, relates only to the August 25 incident.

engaged in core First Amendment activities on the front steps of the John M. Shaw federal courthouse: peacefully protesting government conduct, expressing grievances against U.S. marshals, and documenting these activities through livestreaming and recording.

Mr. Reardon's protest addressed his documented concerns about government overreach. Through a FOIA request, he had learned that U.S. marshals placed a BOLO (Be On the Lookout) alert on him despite his engagement only in protected journalistic activities. His posters [3] and spoken commentary criticized this surveillance and expressed his grievances against the U.S. Marshals Service and Department of Justice for what he perceived as unlawful targeting of his journalism. He was livestreaming[4] the protest using his iPhone and had a separate stationary dedicated camera attached to a tripod to capture higher quality video of the protest.

---

[3] Mr. Reardon's posters said:

**Poster 1:** HAPPY NATIONAL FUCK THE U.S. MARSHALS DAY! #operationsilencethepress

**Poster 2 – Front:** See the Scandal Unfold at www.wtpnews.org AND ON YOUTUBE at WE THE PEOPLE NEWS

**Poster 2 – Back:** Journalism & Cameras ARE NOT CRIMINAL They DO NOT Justify BOLO's & Surveillance #operationsilencethepress

**Poster 3:** FUCK THE Police BACK THE BLUE Until It Happens to You!

[4] The livestream is available on the We The People News Youtube Channel at https://www.youtube.com/live/QAv70Drwt3c?si=-KfZzJTdUqXhjeri

## B.    The marshal's invitation and Mr. Reardon's peaceful compliance

Mr. Reardon initially conducted his protest outside the courthouse barricades on the sidewalk in front of the courthouse steps:



*Defense Exhibit 1*

After a few minutes, U.S. Marshal Hayden Nugent summoned Mr. Reardon inside the courthouse, and Mr. Reardon accepted this invitation, informing his livestream audience of the marshal's request. After passing through the barricade, Mr. Reardon placed his stationary camera near one of the southernmost doors and attempted to enter, but found the door locked.[5] He located an unlocked entrance

---

[5] In the undersigned's experience, the southernmost doors to this courthouse are always locked and the public is always required to enter and exit through one of the northernmost doors.

toward the northern end of the building and entered the courthouse foyer.[6]

Inside, Marshal Nugent immediately threatened Mr. Reardon with arrest for recording *inside* the courthouse, despite having just invited him into the building. Mr. Reardon expressed his frustration at being "baited" inside only to face arrest threats. He directed expletives at Marshal Nugent to express his displeasure with Marshal Nugent's actions, but he never threatened any physical harm and immediately receded from inside the building. His reaction demonstrated his understanding of his rights and his willingness to avoid confrontation while expressing his displeasure with the contradictory treatment.

After exiting the courthouse, Mr. Reardon continued his peaceful protest activities, interacting cordially with all members of the public and never attempting to re-enter the building. At one point, Mr. Reardon holds one of his posters near the window so that the marshals inside can read the poster and holds his phone with the livestream up to the window.[7] Instead of continuing to stand and hold his cellphone with the livestream near the window, Mr. Reardon moves his dedicated camera on the tripod and places it near one of the southernmost locked doors to the courthouse filming in the direction of the window. These two moments are captured in the

---

[6] At this moment, a member of the public is also entering the courthouse and Mr. Reardon steps out of her way politely and says, "Hello, after you," and allows her to enter the courthouse without issue.

[7] It should be noted that at this time another member of the public walks into the courthouse and goes through security without incident and without Mr. Reardon obstructing their access to the building.

following photographs provided in discovery:

 

*Defense Exhibit 2*        *Defense Exhibit 3*

Mr. Reardon then goes back out to the courthouse steps, resumes his protest and interacts with his livestream followers. At one point, an exterior court security officer approaches and records Mr. Reardon on what appears to be that officer's cellphone. That same officer later tells Mr. Reardon that he is trespassing by standing on the front steps of the courthouse.

### C.    Mr. Reardon is arrested despite complying with the marshal's demands

More than twenty minutes after placing his camera near the locked door, Marshal Nugent emerged and demanded removal of the camera and threatened to seize the camera. When Mr. Reardon pointed out that the door was locked and

therefore not obstructed, Marshal Nugent ordered him to move the camera beyond the barricade. The inside of the door in question contains a sign that directs visitors of the courthouse not to exit use that door, that it is an emergency exit only:



*Defense Exhibit 3*

Mr. Reardon immediately complied, grabbing his camera and tripod and backing away from the building. After moving the equipment to a position where neither he nor the camera could obstruct the door, he stated "I'm fine right here." At this point, despite Mr. Reardon's full compliance with the marshal's demands, Marshal Nugent forcibly seized the camera and tripod, causing Mr. Reardon to fall and drop his phone. Marshal Nugent then arrested Mr. Reardon and seized both his camera and cellular telephone, which contained materials related to his journalistic work.

12

On August 26, 2025, Mr. Reardon was charged with a petty offense via a Bill of Information containing one count of loitering, exhibiting disorderly conduct or exhibiting other conduct on federal property in violation of 41 C.F.R. § 102-74.390. Doc. No. 3. The Bill of Information alleges that Mr. Reardon did knowingly and intentionally create loud or unusual noise or a nuisance and/or unreasonably obstructed the usual use of entrances, foyers, lobbies, corridors, in or on Federal property. *Id.*

## III. LEGAL AUTHORITIES

Free speech and the right to assemble and petition the government are an essential part of both the Louisiana and United States Constitutions. The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

The Louisiana Constitution provides:

> **Section 7.** No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.

> **Section 9.** No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances.

LA. CONST. art. I, §§ 7, 9.

Title 41 of the Code of Federal Regulations Section 102-74.390 is titled "What

is the policy concerning disturbances?" and provides in relevant part:

> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other conduct on property that—
>
> (a)   Creates loud or unusual noise or a nuisance;
> (b)   Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;

41 C.F.R. § 102-74.390.

## IV.   ARGUMENT

### A.   This prosecution violates clearly established Supreme Court precedent protecting political protest in traditional public forums

#### 1.   *Edwards v. South Carolina* and *United States v. Hylton* mandate dismissal of the charges

Mr. Reardon's prosecution is constitutionally impermissible under binding Supreme Court precedent. In *Edwards v. South Carolina*, 372 U.S. 229 (1963), African American protesters marched to the South Carolina State House grounds "to submit a protest to the citizens of South Carolina, along with the Legislative Bodies of South Carolina, our feelings and our dissatisfaction with the present condition of discriminatory actions." *Id.* at 230. When police ordered the protesters to disperse, they refused and engaged in "boisterous, loud, and flamboyant conduct." The protesters were arrested and later convicted of breach of peace. *Id.* at 233-34.

The Supreme Court reversed the protesters' convictions as a violation of the First Amendment (incorporated against South Carolina via the Fourteenth Amendment) even though the protestors reacted to law enforcement by becoming loud

14

and unruly. *Id.* at 237-38. The court noted that "not until they were told by police officials that they must disperse on pain of arrest did they do more." *Id.* at 236. The Court found constitutional protection even when the protesters engaged in additional expressive conduct after being ordered to leave.

Mr. Reardon's conduct presents an even stronger case for constitutional protection. Like the *Edwards* protesters, Mr. Reardon was protesting in a traditional public forum to express his "feelings" and his "dissatisfaction" with what he perceived as "discriminatory actions" by the U.S. marshals: specifically, the BOLO alert placed on him despite engaging only in protected journalistic activities. Critically, Mr. Reardon maintained peaceful conduct even when Marshal Nugent created the precise confrontational dynamic the *Edwards* Court recognized as protected. When invited inside only to face immediate arrest threats, Mr. Reardon expressed frustration through profanity but immediately receded from the building without physical confrontation. When later ordered to move his camera, he immediately complied, demonstrating restraint that exceeds even the *Edwards* protesters.

The Fifth Circuit's decision in *United States v. Hylton*, 710 F.2d 1106 (5th Cir. 1983), likewise mandates dismissal of this case. In *Hylton*, the defendant filed criminal complaints against IRS agents who had unlawfully entered her property, and the government subsequently indicted her for obstruction of justice based on her complaints against the agents. The Fifth Circuit affirmed the district court's acquittal, holding that criminal sanctions could not be imposed for the defendant's

"legitimate and protected exercise of her right to petition for the redress of grievances." *Id.* at 1111-12.

The court in *Hylton* emphasized that the defendant "genuinely attempted to protect her rights through the orderly pursuit of justice" and concluded that "we likewise cannot condone the imposition of criminal sanction for Hylton's exercise of her constitutional right." *Id.* at 1112. Mr. Reardon's situation presents an even stronger case for constitutional protection. His FOIA request revealing the BOLO alert and his attempts to file an official complaint in person against the U.S. marshals at the Lafayette courthouse[8] demonstrates his "orderly pursuit of justice" through official channels. His peaceful protest and journalistic documentation represent the traditional means of seeking redress of grievances in the public forum. The government's prosecution of this protected activity constitutes precisely the type of indirect restraint on fundamental constitutional rights that the First Amendment prohibits.

> 2.    Courthouse steps constitute a traditional public forum entitled to the highest level of First Amendment protection

Mr. Reardon's activities occurred on the courthouse steps, which constitute a traditional public forum entitled to the highest level of First Amendment protection. In *United States v. Grace*, 461 U.S. 171, 180 (1983), the Supreme Court established that "the public sidewalks forming the perimeter of the Supreme Court grounds, in

---

[8] Mr. Reardon was turned away by Marshall Farrish who told him to complain to Washington D.C.

our view, are public forums and should be treated as such for First Amendment purposes." The Court emphasized that "traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *Id.* at 179.

The Supreme Court has long recognized that the right to peaceably assemble "existed long before the adoption of the Constitution of the United States" and "derives its source…from those laws whose authority is acknowledged by civilized man throughout the world." *United States v. Cruikshank*, 92 U.S. 542, 551 (1875). The Court explained that, "[t]he right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, *or for any thing else connected with the powers or the duties of the national government*, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States." *Id.* at 552 (emphasis added).

### 3. Mr. Reardon's conduct involves three forms of constitutionally protected expression

Mr. Reardon's conduct involves three forms of constitutionally protected expression requiring the Bill of Information to be dismissed, even if his conduct would otherwise violate 41 C.F.R. § 102-74.390. *See Brown v. State of La.*, 383 U.S. 131, 142 (1966) (reversing the breach of peace convictions of African American protesters holding that even if the protesters' conduct were within the scope of the breach of

17

peace statute, "we would be required to assess the constitutional impact of its application, and we would have to hold that the statute cannot constitutionally be applied to punish petitioners' actions in the circumstances of this case.").

 *First*, Mr. Reardon's protest activities constitute core political speech criticizing government officials and their conduct. His posters documented his grievances against the U.S. Marshals Service and Department of Justice for what he perceived as unlawful surveillance through the BOLO alert placed on him despite engaging only in protected journalistic activities. Such criticism is "at the very center of the constitutionally protected area of free expression." *New York Times Co. v. Sullivan*, 376 U.S. 254, 292 (1964).

 *Second*, his journalistic documentation through recording and livestreaming on We the People News represents protected press activity. The Supreme Court has recognized that newsgathering is entitled to First Amendment protection. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) (acknowledging that newsgathering activities merit First Amendment protection and that "without some protection for seeking out the news, freedom of the press could be eviscerated."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (recognizing the First Amendment protects the general right of the public to gather information and to speak and publish that information).

 Recording government officials constitutes core First Amendment activity. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about

government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs."). The First Circuit specifically recognized that modern technology has eliminated meaningful distinctions between traditional journalists and citizens documenting events of public concern, noting that "changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw" given that "many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew." *Id.* at 84. Mr. Reardon's use of both handheld and stationary cameras to document his protest for his 3,000-subscriber YouTube channel demonstrates precisely this intersection of modern journalism and traditional protest activities that the First Amendment protects.

*Third*, his expression of grievances against government officials and request for accountability constitutes petitioning government for redress, which is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). Mr. Reardon's protest specifically addressed his documented concerns about government overreach, including the BOLO alert he discovered through his FOIA request.

### 4.   Offensive language does not remove First Amendment protection

That the content of Mr. Reardon's speech, both his spoken words and the language on his posters, might be viewed by some as containing coarse or offensive

19

language does not remove its protection under the First Amendment. "Speech is often provocative and challenging." *Edwards*, 372 U.S. at 237. Indeed, speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger" because the speech "may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Id.*; *see also United States v. O'Dwyer*, No. CRIM.10-034, 2010 WL 2606657 (E.D. La. June 24, 2010), *aff'd*, 443 F. App'x 18 (5th Cir. 2011) (distinguishing explicit threats from protected hyperbolic speech and holding that "phrases taken out of context could suggest a threat, but reading the sentences as a whole, no threat as a matter of law was made.").

### B.  The prosecution constitutes content-based discrimination requiring strict scrutiny

Section 102-74.390 fails strict scrutiny when applied to suppress criticism of government officials. The government's selective enforcement demonstrates impermissible content-based targeting. Mr. Reardon was subject to BOLO surveillance specifically because of his journalism critical of federal law enforcement. When he protested this surveillance, he was arrested for conduct that would be ignored if directed at any target other than federal officers.

The allegedly offensive nature of Mr. Reardon's language does not remove constitutional protection. In *Brown v. Louisiana*, the Court held that even when protesters' conduct might fall within the technical scope of a statute, courts must "assess the constitutional impact of its application" and cannot allow prosecution to

punish protected expression. 383 U.S. 131, 142 (1966). The government cannot transform protected political speech into criminal conduct by characterizing criticism of federal officers as "disorderly conduct."

Content-based restrictions in traditional public forums are subject to strict scrutiny and can be sustained only if they are "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The government cannot meet this demanding standard when prosecuting peaceful journalistic documentation on courthouse steps.

### C.    The "loud or unusual noise or a nuisance" provision violates the First Amendment as applied to Mr. Reardon's protected speech

The Fifth Circuit has never addressed the constitutionality of § 102-74.390. And no circuit has addressed the application of § 102-74.390 to peaceful journalistic documentation and political protest on courthouse steps, which constitute a traditional public forum entitled to the highest level of First Amendment protection.[9]

---

[9] The First Circuit in *United States v. Strong*, 724 F.3d 51, 57-58 (1st Cir. 2013), upheld the regulation against vagueness and overbreadth challenges as applied to a case involving willful contamination of a courthouse restroom. The Ninth Circuit has twice rejected constitutional challenges: in *United States v. Zagorovskaya*, 628 Fed. Appx. 503, 504-05 (9th Cir. 2015), involving threats against a security officer; and in *United States v. Lawrence*, 755 Fed. Appx. 703, 704-05 (9th Cir. 2019), the court applied constitutional avoidance principles to avoid vagueness concerns by interpreting subsections (a)-(d) as defining "disorderly conduct." The Tenth Circuit in *United States v. Baldwin*, 745 F.3d 1027, 1031-32 (10th Cir. 2014), found the regulation constitutional as applied to a defendant who drove away during a traffic stop on federal property. The Second Circuit in *United States v. Wasylyshyn*, 979 F.3d 165, 170-71, 176 (2d Cir. 2020), upheld the regulation as applied to a

1.    **Mr. Reardon's vocal expression constitutes protected political speech**

The government cannot prosecute Mr. Reardon under 41 C.F.R. § 102-74.390(a) for creating "loud or unusual noise or a nuisance" when his vocal expressions consisted entirely of protected political speech criticizing government officials. Mr. Reardon's spoken commentary during his protest addressed his grievances against the U.S. Marshals Service, documented through his FOIA-obtained evidence of the BOLO alert placed on him for engaging in journalistic activities.

The government cannot regulate protected political speech based on its volume or allegedly offensive content when that speech occurs in a traditional public forum. In *Edwards*, the Court protected protesters who engaged in "boisterous, loud, and flamboyant conduct" while expressing political grievances. 372 U.S. at 237-38. Similarly, in *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949), the Court reversed a conviction for breach of peace, emphasizing that speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Mr. Reardon's actions in this case are thus constitutionally "protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises

---

protester who engaged in physical confrontation with a security officer inside a courthouse lobby. The Fourth Circuit in *United States v. Moriello*, 980 F.3d 924, 932 (4th Cir. 2020), found the regulation constitutional as applied to disruptive conduct by an attorney inside an immigration courtroom during active proceedings.

far above public inconvenience, annoyance, or unrest." *Id.*; *See also Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 377 (1997) ("commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum").

### 2.   Unconstitutional content-based discrimination in enforcement

The government's application of the noise provision demonstrates impermissible content-based discrimination. Mr. Reardon's prosecution stems not from any genuinely disruptive volume level—he was outside the courthouse when arrested—but from the content of his criticism of government officials. The BOLO alert placed on Mr. Reardon despite his engagement only in protected journalistic activities demonstrates content-based targeting. His protest specifically addressed this surveillance, expressing grievances about what he perceived as retaliation for his journalism.

The Supreme Court has recognized that selective enforcement of even a content-neutral law may violate the First Amendment. *See, e.g., Wayte v. United States*, 470 U.S. 598, 610 (1985); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1146-47 (9th Cir. 2005) (Even if a law is facially "content-neutral," the government still impermissibly regulates based on content if it selectively enforces its laws.). Here, the undersigned has no indication that the government has ever prosecuted other individuals under

23

Section 102-74.390(a) for being loud or boisterous outside of the Lafayette courthouse, despite yearly events such as Mardis Gras parades and Festival International de Louisiane occurring at the same location Mr. Reardon was protesting. Mr. Reardon's arrest under Section 102-74.390(a) is impermissible content-based enforcement of the regulation.

### 3.    Unconstitutional vagueness of the noise provision

The "loud or unusual noise or a nuisance" standard provides no meaningful guidance about what conduct is prohibited. § 102-74.390(a). A person of ordinary intelligence cannot determine what volume level or type of expression crosses the line from protected speech to criminal conduct. The regulation's failure to provide objective standards for enforcement creates the arbitrary application that the vagueness doctrine prevents. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

Here the vagueness of "loud or unusual noise or a nuisance," § 102-74.390(a), "may authorize and even encourage arbitrary and discriminatory enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999), by failing to establish minimal guidelines prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

This vagueness is compounded by the complete absence of any evidence that Mr. Reardon's vocal expressions actually disrupted courthouse operations or

interfered with any legitimate governmental interest. The record shows that members of the public continued to enter and exit the courthouse during his protest without incident, demonstrating that any alleged "nuisance" was merely the government's disagreement with his message rather than any actual interference with courthouse functions.

### D. The "unreasonably obstructs the usual use of entrances" provision is unconstitutional as applied to Mr. Reardon's camera placement

#### 1. No actual obstruction occurred

The government cannot sustain a prosecution under 41 C.F.R. § 102-74.390(b) for "unreasonably obstruct[ing] the usual use of entrances" when no obstruction occurred. Mr. Reardon placed his camera near a door that was locked and always remains locked to the public. As he noted to Marshal Nugent, no actual obstruction occurred or could occur when the door is inaccessible to the public. The record demonstrates that during Mr. Reardon's protest, other members of the public entered and exited the courthouse through the operational northern entrance without any interference from his activities.



*Defense Exhibit 3*

The regulation's text requires that conduct "unreasonably obstruct" the "usual use" of entrances. When a door is permanently locked to public access, there is no "usual use" to obstruct. An emergency exit is, by its very nature, not in "usual use." And Mr. Reardon's camera was certainly not unreasonably obstructing the emergency exit as it could easily be stepped around or pushed aside in a true emergency. The government's interpretation would criminalize any expressive activity near any courthouse entrance, regardless of whether that entrance is actually accessible or whether any person is actually impeded.

### 2.    Camera placement as protected newsgathering activity

Mr. Reardon's camera placement constitutes protected newsgathering activity entitled to First Amendment protection. *Branzburg*, 408 U.S. at 681; *Richmond*

*Newspapers, Inc.*, 448 U.S. at 576. The positioning of recording equipment to document newsworthy events represents core journalistic activity that cannot be criminalized absent compelling justification narrowly tailored to achieve legitimate governmental ends. *Perry Educ. Ass'n*, 460 U.S. at 45 (1983). The government's demand for camera removal, despite no actual obstruction occurring, demonstrates that the restriction aimed at suppressing documentation of political speech rather than addressing any legitimate regulatory concern.

### 3.    Overbreadth of the obstruction provision as applied

When applied to Mr. Reardon's peaceful camera placement near a locked door, the regulation sweeps too broadly, capturing protected journalistic activity alongside any legitimately regulable conduct. The overbreadth doctrine is designed "to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). A regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid. *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987). The regulation's prohibition on conduct that "unreasonably obstructs the usual use of entrances" includes within its scope activities protected by the First Amendment when applied to newsgathering equipment placed in locations where no actual obstruction occurs. The regulation is overbroad as applied to Mr. Reardon's actions in this case.

### 4.    Compliance demonstrates absence of intent to obstruct

Mr. Reardon's immediate compliance with Marshal Nugent's demands

demonstrates the absence of any intent to obstruct courthouse operations. When Marshal Nugent emerged and demanded removal of the camera, Mr. Reardon grabbed his camera and tripod and backed away from the building. This full compliance occurred before any arrest and demonstrates that Mr. Reardon sought to engage in protected expression while respecting legitimate regulatory concerns.

The government's prosecution despite this immediate compliance reveals that the charges target the content of Mr. Reardon's expression rather than any genuine concern about obstruction. Under these circumstances, the regulation as applied violates both the overbreadth and vagueness doctrines by criminalizing protected expressive conduct without providing adequate notice of what activities are prohibited.

## V.    CONCLUSION

Mr. Reardon's conduct falls squarely within the Supreme Court's protection for political protest in traditional public forums. His immediate compliance with law enforcement directives, peaceful interaction with the public, and legitimate journalistic purpose distinguish this case from any legitimate application of Section 102-74.390. The government's prosecution violates clearly established First Amendment precedent and cannot survive constitutional scrutiny.

The regulation's application to Mr. Reardon's conduct fails every constitutional test: it restricts protected expression in a traditional public forum, discriminates based on the content of his criticism, lacks narrow tailoring to serve legitimate

governmental interests, and provides inadequate notice of prohibited conduct.

WHEREFORE, defendant Matthew Reardon respectfully requests that this Court grant his Motion to Dismiss the Bill of Information and dismiss all charges against him.

RESPECTFULLY SUBMITTED,

REBECCA L. HUDSMITH
Federal Public Defender

BY:    *s/ Dustin C. Talbot*
          DUSTIN C. TALBOT
          Appellate Chief
          Federal Public Defender's Office
          Middle and Western Districts of Louisiana
          102 Versailles Boulevard, Suite 816
          Lafayette, Louisiana 70501
          Telephone: (337) 262-6336

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 16, 2025, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*