UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO:  6:25-MJ-00153 |
| | 6:25-CR-00227-CBW-1 |
| VERSUS | |
| | MAGISTRATE JUDGE WHITEHURST |
| MATTHEW REARDON | |

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE BILL OF INFORMATION

NOW INTO COURT, through the undersigned counsel, comes Defendant Matthew Reardon, who respectfully submits this reply memorandum in further support of his motion to dismiss the Bill of Information. Mr. Reardon's motion is based on the grounds that the charged conduct constitutes protected expression under the First Amendment to the United States Constitution, that the prosecution seeks to punish his exercise of fundamental rights of free speech, press, and petition for redress of grievances, and that 41 C.F.R. § 102-74.390 is facially overbroad and unconstitutional as applied to his peaceful journalistic and protest activities conducted in a traditional public forum. For the reasons set forth in this memorandum, this Court should dismiss all charges as violative of clearly established constitutional principles.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... 2

TABLE OF AUTHORITIES ............................................................. 4

I. INTRODUCTION ..................................................................... 5

II. REPLY ARGUMENT ................................................................. 6

    **A.**    **This prosecution violates clearly established Supreme Court precedent protecting political protest in traditional public forums** ............................ 6

        1.    There is a functional and constitutional difference between the outside of the courthouse and the interior of the courthouse ................ 6

        2.    *United States v. Grace* controls this case ................................ 8

        3.    The government's reliance on *Hodge v. Talkin* is misplaced ............... 10

        4.    Even under nonpublic forum analysis, this prosecution fails ............. 12

    **B.**    **The prosecution constitutes content-based discrimination requiring strict scrutiny** ................................................................ 15

    **C.**    **The "loud or unusual noise or a nuisance" provision violates the First Amendment as applied to Mr. Reardon's protected speech** ...................... 16

        1.    Mr. Reardon's vocal expression constitutes protected political speech ................................................................ 16

        2.    Unconstitutional vagueness of the noise provision ............................. 17

    **D.**    **The "unreasonably obstructs the usual use of entrances" provision is unconstitutional as applied to Mr. Reardon's camera placement** ............ 19

        1.    The regulation requires obstruction of "usual use" .............. 19

        2.    The government's argument that the moved camera still obstructed access lacks merit .................................................... 20

        3.    Camera placement as protected newsgathering activity ..................... 21

III. CONCLUSION  ................................................................................ 22

CERTIFICATE OF SERVICE  ........................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                                                      **<u>PAGE</u>**

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ................................................................ 18

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ................................................... 16-17

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015)................................................. 10-12

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................ 18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) .............. 12-13

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ............................................................. 17

*United States v. Grace*, 461 U.S. 171 (1983) ........................................................ 8-10

**<u>STATUTES</u>**

U.S. Const. amend. I (First Amendment) ...........................................................*passim*

40 U.S.C. § 6135..................................................................................................... 11

41 C.F.R. § 102-74.390..........................................................................................*passim*

## I.    INTRODUCTION

The government's opposition fundamentally misconstrues the nature of Mr. Reardon's constitutional challenge. The government devotes substantial attention to defending the facial validity of 41 C.F.R. § 102-74.390, arguing that "only the facial challenge is ripe for adjudication pre-trial." Gov. Resp. at 8. But Mr. Reardon has not mounted a facial challenge to the regulation. His arguments concern how the regulation was applied to his specific conduct in this case: peaceful political protest and journalistic documentation on courthouse steps.

The government acknowledges that whether the regulation may be dismissed prior to trial depends on "whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." Gov. Resp. at 8. While the government asserts factual disputes exist, the video evidence of the arrest resolves the material facts. The video establishes that Mr. Reardon was outside the courthouse building, that his camera was positioned under the covered exterior portico rather than inside any vestibule, that he moved the camera when directed, and that he was arrested immediately after complying. These facts are not genuinely in dispute. The legal question presented is whether the government may criminalize this conduct consistent with the First Amendment. Under clearly established Supreme Court precedent, the answer is no.

II.   REPLY ARGUMENT

A.   **This prosecution violates clearly established Supreme Court precedent protecting political protest in traditional public forums**

The government constructs its response around defending the facial constitutionality of § 102-74.390 as applied to nonpublic forums. Gov. Resp. at 10-16. This approach fails because Mr. Reardon does not challenge the regulation's facial validity, nor does he contest that certain courthouse interior spaces may constitute nonpublic forums where the government may impose reasonable restrictions.

1.   **There is a functional and constitutional difference between the *outside* of the courthouse and the interior of the courthouse**

The central dispute in this case concerns the proper characterization of the space where Mr. Reardon's protest occurred. The government argues that "courthouse lobbies, foyers, entrances, elevators, and office spaces are paradigmatic nonpublic forums." Gov. Resp. at 11. The government further contends that the portico where Mr. Reardon positioned his camera "serves as a transitional space to the interior" and is therefore subject to the same restrictions as interior courthouse spaces. Gov. Resp. at 4.

This argument fundamentally misunderstands both the facts and the law. As a factual matter, Mr. Reardon was *outside* the courthouse. He stood under a covered exterior walkway providing public access to the building. The presence of a roof over this exterior walkway does not transform it into an interior space. Millions of Americans walk under covered exterior walkways every day when approaching

buildings. These covered walkways provide weather protection while remaining exterior public spaces.

The government's characterization of the portico as "a transitional space to the interior" is particularly problematic. Gov. Resp. at 4. Under this theory, any covered area near a courthouse entrance would lose First Amendment protection. This theory would effectively eliminate the right to protest at courthouse entrances, as nearly all modern courthouses feature some form of covered entrance. The government cites no authority for the proposition that covered exterior walkways lose their public forum character.

More fundamentally, the government's approach conflates the question of where speech occurs with the question of what forum protections apply. The government appears to assume that any space proximate to courthouse doors must be subject to the same restrictions as the courthouse interior. But Supreme Court precedent establishes precisely the opposite principle: exterior areas providing public access to government buildings retain their traditional public forum character even when immediately adjacent to the building.

The government's argument also ignores the functional and historical characteristics that define traditional public forums. Courthouse steps and exterior walkways are places where citizens have gathered throughout American history to voice their views about judicial proceedings, government conduct, and matters of public concern. Citizens approach courthouses on these exterior walkways to observe

judicial proceedings, to serve as jurors, to appear as parties or witnesses, and to engage with the justice system. These spaces facilitate the citizenry's interaction with a core government function—the administration of justice. This historical and functional connection to democratic self-governance confirms their status as traditional public forums. The government's attempt to extend the nonpublic forum analysis to exterior covered areas would represent a dramatic and unprecedented contraction of First Amendment protection.

2.    *United States v. Grace* controls this case

The Supreme Court's decision in *United States v. Grace*, 461 U.S. 171 (1983), controls this case and mandates dismissal. In *Grace*, the Court addressed a statute prohibiting displays and demonstrations on Supreme Court grounds, including the public sidewalks surrounding the Court building. The government argued that these sidewalks, though publicly accessible, could be restricted because they were on Supreme Court property and provided direct access to the Court building.

The Supreme Court rejected this argument. The Court held that public sidewalks retain their character as traditional public forums even when located on government property and even when they provide direct access to a government building. The Court emphasized that "traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *Id.* at

8

179. The fact that these sidewalks were on Supreme Court property and provided direct access to the Court building did not eliminate their public forum character.

The exterior steps and covered walkway of the Lafayette courthouse have an even stronger claim to traditional public forum status than the perimeter sidewalks in *Grace*. Courthouse steps are not merely adjacent to a courthouse; they are the primary pathway citizens use to access the courthouse and engage with the justice system. Throughout American history, citizens have gathered on courthouse steps to voice their views about judicial proceedings, government conduct, and matters of public concern. Courthouses do not just house courtrooms and judges; they house government agencies like the U.S. Marshals Service and U.S. Department of Justice that citizens might want to protest or from whom they might seek redress. This functional and historical connection to core democratic processes confirms their status as traditional public forums.

The government's only response to *Grace* is to argue that the Court "distinguished the building's interior, which was not a public forum." Gov. Resp. at 12. This is true but irrelevant. The question in this case is not whether the courthouse interior is a public forum. Mr. Reardon was *outside* the courthouse. The question is whether exterior areas providing public access to the courthouse retain their public forum character. *Grace* tells us the answer is yes.

The government's attempt to characterize the covered exterior portico as functionally equivalent to the courthouse interior cannot be reconciled with *Grace*.

The sidewalks in *Grace* were immediately adjacent to the Supreme Court building and provided direct access to the Court's entrance doors. If proximity to doors and direct access to the building eliminated public forum status, then the sidewalks in *Grace* would not have been protected. The Court's analysis focused on whether the space retained the characteristics of a traditional public forum—a place where citizens historically gather to engage with their government—not on whether the space was proximate to doors or covered from the elements.

The government's opposition effectively asks this Court to distinguish *Grace* based on the presence of a roof. But nothing in *Grace* suggests that covered exterior walkways lose their public forum character. Many sidewalks feature awnings, bus shelters, or other weather protection without losing their status as traditional public forums. The presence of a roof does not transform exterior space into interior space or eliminate public forum protections.

### 3. The government's reliance on *Hodge v. Talkin* is misplaced

The government attempts to avoid *Grace* by relying on the out-of-circuit case *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015), which addressed the Supreme Court's enclosed marble plaza. Gov. Resp. at 13-14. But *Hodge* carefully limited its holding to the specific architectural features that distinguished that plaza from traditional public forums. The *Hodge* court emphasized that the plaza is an elevated terrace, paved in distinctive white marble, surrounded by a low marble wall that defines its boundaries, and contains fountains, flagpoles, and benches creating an

integrated architectural statement. The court found that these features conveyed to visitors that they had entered "some special type of enclave." *Id.* at 1158.

Critically, the regulation at issue in *Hodge* was not the general federal property regulation involved here. Instead, *Hodge* concerned 40 U.S.C. § 6135, a statute specifically addressing the Supreme Court's grounds and plaza. That statute was enacted to govern a particular architectural space: the distinctive elevated marble plaza created when the Supreme Court building was constructed in the 1930s.

By contrast, 41 C.F.R. § 102-74.390 is a general regulation applicable to all federal property. It was not enacted to address any particular architectural feature of the Lafayette courthouse. It does not identify courthouse steps or covered walkways as restricted zones. The distinction matters: when Congress wants to restrict a specific space like the Supreme Court plaza, it enacts a specific statute for that purpose, as it did with 40 U.S.C. § 6135. The government cannot use a general property regulation to accomplish the same result for every federal courthouse without regard to the traditional public forum character of courthouse steps and exterior walkways.

More fundamentally, the exterior steps and covered walkway of the Lafayette courthouse possess none of the distinctive characteristics that made the Supreme Court plaza in *Hodge* something other than a traditional public forum. The Lafayette courthouse exterior is not enclosed by marble walls. It is not paved in distinctive materials. It does not feature fountains, flagpoles, or benches creating an integrated

11

architectural statement. It is not an elevated terrace separated from surrounding public areas. It is a standard courthouse entrance featuring steps and a covered walkway providing direct public access from the sidewalk to the building. These are functional outdoor pathways open to the public and used for public events including *Mardi Gras* and *Festival International de Louisiane*.

The government includes a photograph of the Supreme Court plaza in its opposition brief to support its reliance on *Hodge*. Gov. Resp. at 13. This photograph actually undermines the government's position. The Supreme Court plaza is visually and architecturally distinctive. It is an elevated, enclosed, formally designed forecourt that clearly communicates its character as a special space. The Lafayette courthouse exterior has no comparable features. It is an ordinary courthouse entrance with steps and a covered walkway. No visitor would understand it as "some special type of enclave" separate from the surrounding public areas. 799 F.3d at 1159. *Hodge* does not hold that any exterior area near courthouse doors loses public forum protection. It holds that a specific, architecturally distinctive elevated plaza with unique features may be treated differently from ordinary sidewalks and walkways. The Lafayette courthouse exterior has none of these distinctive features.

### 4.    Even under nonpublic forum analysis, this prosecution fails

Even if this Court were to accept the government's characterization of some portion of the exterior courthouse area as a nonpublic forum—a characterization Mr. Reardon contests—the prosecution still fails. In nonpublic forums, restrictions must

be "reasonable" and "viewpoint neutral." Gov. Resp. at 10-11 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

The government cannot meet this standard. *First*, prosecuting peaceful political protest and journalistic documentation conducted outside a courthouse is not "reasonable" in any meaningful sense. The government asserts its interests as "ensuring the security, order, and functioning of judicial proceedings." Gov. Resp. at 3. While these are legitimate interests, Mr. Reardon's conduct threatened none of them. He stood outside the courthouse holding signs. He spoke critically of government officials. He positioned a camera outside the building to document his protest. None of this conduct created any security threat or interfered with courthouse operations.

The government does not allege that Mr. Reardon attempted to enter the building with prohibited items. The government does not allege that Mr. Reardon blocked anyone's access to the building. The government does not allege that Mr. Reardon disrupted any judicial proceeding. The government does not allege that any person was unable to enter or exit the courthouse due to Mr. Reardon's presence or equipment. The government does not allege any actual security threat or any actual interference with courthouse operations.

The government emphasizes that Mr. Reardon placed his camera "directly in front of one of the available emergency exits." Gov. Resp. at 6. But several points undermine this rationale. The door was locked and not in use as an entrance during

normal operations. The government acknowledges the door served as an emergency exit rather than as a public entryway. The camera was outside the courthouse. The door opened outward onto the exterior area where the camera was positioned. Any object positioned outside an outward-opening door would be pushed aside by the door itself if the door were opened in an emergency. The camera could not physically prevent the door from opening because the door's outward swing would displace any external object. Most importantly, Mr. Reardon moved his camera when directed to do so. At that point, even the government's speculative obstruction theory evaporated. Yet the government arrested him anyway. This sequence of events demonstrates that the asserted concern about obstruction was pretextual. If the government's concern was genuinely about the camera's position creating a safety hazard, the appropriate response after Mr. Reardon moved the camera would have been to allow him to continue his protest. Instead, the government arrested him and seized his recording equipment, preventing him from continuing his constitutionally protected activity.

Second, the enforcement is not viewpoint neutral. The government issued a BOLO alert on Mr. Reardon based on his journalism critical of federal law enforcement. When he protested this surveillance, he was arrested. The government's emphasis on the "profanity" in Mr. Reardon's speech reveals the viewpoint-based nature of enforcement. Political speech does not lose protection because it offends officials. The government's focus on Mr. Reardon's criticism, rather than on any actual security concern, demonstrates that this prosecution targets his message.

14

Even under the more deferential standard applicable to nonpublic forums, the government cannot criminalize peaceful political expression conducted outside a courthouse without demonstrating actual interference with legitimate governmental interests. The government has made no such demonstration. The government points to no disrupted proceeding, no blocked access, no security threat. The government's case rests entirely on its disapproval of Mr. Reardon's message and its discomfort with his criticism of the U.S. Marshals Service.

**B.    The prosecution constitutes content-based discrimination requiring strict scrutiny**

The government argues that § 102-74.390 is content-neutral because "a person who obstructs an entrance while praising the government is treated no differently than a person obstructing an entrance while criticizing the government." Gov. Resp. at 15. This response misses Mr. Reardon's argument entirely.

Mr. Reardon does not contend that the regulation's *text* discriminates based on content. He argues that the government's *enforcement* demonstrates content-based targeting. The evidence of viewpoint discrimination is compelling and specific.

Before the August 25, 2025 arrest, the U.S. Marshals Service issued a BOLO (Be On the Lookout) alert regarding Mr. Reardon. This alert was based on Mr. Reardon's journalistic activities documenting federal law enforcement conduct at the Lafayette courthouse and other federal facilities. Mr. Reardon's journalism, published through We the People News, has been critical of certain U.S. Marshals Service practices and procedures.

15

The BOLO alert itself constitutes evidence of viewpoint-based targeting. Mr. Reardon was engaged in lawful journalistic activity protected by the First Amendment. The issuance of a BOLO alert for a journalist engaged in protected newsgathering demonstrates that federal authorities were monitoring and tracking Mr. Reardon based on the content and viewpoint of his journalism. This is precisely the type of content-based enforcement that triggers strict scrutiny.

And the government does not address why other individuals who engage in comparable conduct during public events—such as Mardi Gras parades and Festival International de Louisiane occurring in the same locations—are not prosecuted for creating "loud or unusual noise" or temporarily congregating near courthouse entrances.

C. **The "loud or unusual noise or a nuisance" provision violates the First Amendment as applied to Mr. Reardon's protected speech**

    1. **Mr. Reardon's vocal expression constitutes protected political speech**

The government characterizes Mr. Reardon's speech as "shouting profanities and directing obscene comments at marshals" combined with "obstruction and refusal to comply with lawful orders." Gov. Resp. at 7. This characterization fundamentally misunderstands political protest and the protection it receives under *Edwards v. South Carolina*, 372 U.S. 229 (1963).

In *Edwards*, the Supreme Court protected protesters who engaged in "boisterous, loud, and flamboyant conduct" while expressing political grievances. The

Court reversed breach of peace convictions even though the protesters became loud and unruly after police ordered them to disperse. Even though the protestors refused to comply with the police orders to disperse. *Id.* at 235-38. The Supreme Court has emphasized that speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

Mr. Reardon was outside the courthouse voicing criticism of government officials and expressing grievances about perceived government overreach. The fact that he used profanity does not remove constitutional protection. The fact that his speech may have offended officials does not justify prosecution. Citizens do not forfeit First Amendment protection when they express political views in language that government officials find offensive.

## 2.    Unconstitutional vagueness of the noise provision

The government cites out of circuit precedent rejecting *facial* vagueness challenges to the regulation but does not engage with Mr. Reardon's specific argument: when applied to vocal political protest outside a courthouse, the terms "loud or unusual noise or a nuisance" lack constitutionally adequate objective standards. Gov. Resp. at 21-22.

What volume level constitutes "loud" for purposes of criminalizing speech outside a courthouse? The regulation provides no standard. Is passionate political oratory "loud"? Is any volume audible inside the building "loud"? Is a raised voice

"loud"? Is the music blasted at the *Scène Wellcare* stage during Festival International de Louisiane directly in front of the courthouse "loud"? Are the screams of joy from Mardi Gras revelers on the courthouse steps "loud"? These questions have no answers in the regulation's text. The regulation provides no decibel threshold, no distance measurement, no comparison to ambient noise levels, and no objective criteria whatsoever. This absence of standards means that enforcement depends entirely on the subjective judgment of the officer, creating the risk of viewpoint-based or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

"Unusual" is equally standardless. Unusual compared to what? Typical conversation? Ambient street noise? The volume at which other citizens speak outside courthouses during public events? The volume at which government officials themselves speak? The regulation provides no comparison point.

And "nuisance" is entirely subjective. What constitutes a "nuisance" depends on whether the listener agrees with or is offended by the speaker's message. A listener who supports Mr. Reardon's message might view his protest as important civic engagement. A listener who opposes his message or works for the agency he is criticizing might view the same conduct as a "nuisance." This subjective standard invites viewpoint-based enforcement.

The absence of objective standards invites the arbitrary enforcement evident in this case. Mr. Reardon's speech was no louder or more "unusual" than speech at

18

numerous public events occurring in the same location. But his speech criticized federal officers. That criticism, not any objective violation of noise standards, motivated this prosecution.

### D. The "unreasonably obstructs the usual use of entrances" provision is unconstitutional as applied to Mr. Reardon's camera placement

#### 1. The regulation requires obstruction of "usual use"

The regulation prohibits conduct that "*unreasonably* obstructs the *usual* use of entrances." 41 C.F.R. § 102-74.390(b) (emphasis added). The government argues that Mr. Reardon obstructed an emergency exit by placing a camera outside a door. Gov. Resp. at 6-7. This argument fails on multiple grounds.

First, the term "*usual use*" has meaning. A door that remains locked to public access and serves only as an emergency exit is not in "usual use" during normal operations. The usual use of an emergency exit is to remain closed and locked. An emergency exit's use in an actual emergency is not its "usual use;" it is its exceptional use. The usual use of a main entrance is for people to enter and exit. The usual use of an emergency exit is to remain locked and closed. The government's interpretation would read the word "usual" out of the regulation entirely.

Second, Mr. Reardon's camera was outside the courthouse. The government acknowledges the door was locked. Gov. Resp. at 6. In the undersigned's experience, this door remains locked at all times during normal courthouse operations, and the public enters and exits through different doors. Mr. Reardon pointed this out to Marshal Nugent. A camera positioned outside a locked door that the public cannot

access does not obstruct the usual use of that door.

Third, the door opens outward. Any object positioned outside an outward-opening door would be pushed aside by the door itself if the door were opened in an emergency. The camera could not physically prevent the door from opening because the door's outward swing would displace any external obstruction. This physical reality demonstrates that no actual obstruction of emergency egress occurred or could occur.

Fourth, even assuming the camera's position could theoretically impede emergency egress in some hypothetical emergency, Mr. Reardon moved the camera when directed to do so. The government disputes whether his compliance was "immediate," arguing he first responded with profanity and only moved after "repeated warning." Gov. Resp. at 7. But verbal protest combined with physical compliance is not obstruction. The First Amendment protects Mr. Reardon's right to voice disagreement while complying with lawful directives. He moved his camera away from the door. At that point, any theoretical obstruction ceased to exist. The government arrested him anyway, demonstrating that the asserted concern about obstruction was pretextual.

### 2. The government's argument that the moved camera still obstructed access lacks merit

The government suggests that even after Mr. Reardon moved his camera, it "still close enough to continue to film inside the courthouse and would have obstructed foot traffic into or out of the courthouse if left recording at that location."

20

Gov. Resp. at 7-8. This argument is unsupported and contradicted by the video evidence.

Mr. Reardon moved his camera away from the door. He then stated "I'm fine right here," indicating his understanding that the camera no longer obstructed the entrance. At this point, the government seized his equipment and arrested him. If the camera's new position still created an obstruction, Marshal Nugent could have directed Mr. Reardon to move it further. Instead, the government chose immediate arrest and seizure.

The government's assertion that the camera "would have obstructed foot traffic" is flatly contradicted by the video evidence. Moreover, the record shows that members of the public continued entering and exiting the courthouse throughout Mr. Reardon's protest without incident. No one's access was impeded or obstructed. The government points to no instance of anyone being unable to enter or exit due to the camera's position.

### 3.  Camera placement as protected newsgathering activity

Mr. Reardon positioned his camera outside the courthouse to document his protest for We the People News, his journalism platform with over 3,000 subscribers. This positioning of recording equipment to document newsworthy events constitutes protected First Amendment activity. The government does not dispute Mr. Reardon's journalistic purpose. Gov. Resp. at 4.

If the government had a genuine concern about the camera's position creating

a safety issue, reasonable accommodation was available. The government could have directed Mr. Reardon to position his camera in a specific location outside the courthouse that would allow him to document his protest while addressing any safety concerns. Instead, the government chose the most restrictive response: seizing the equipment and arresting the journalist.

The government's own delay undermines its safety rationale. If the camera created an urgent safety hazard, why did marshals wait over twenty minutes before addressing it? Gov. Resp. at 6-8. The government provides no explanation. The more plausible explanation is that the camera's position outside a locked door created no actual safety concern, and the government invoked the obstruction provision as a pretext for suppressing Mr. Reardon's protest and journalistic documentation.

## III.    CONCLUSION

Mr. Reardon's conduct falls squarely within the Supreme Court's protection for political protest in traditional public forums. His immediate compliance with law enforcement directives, peaceful interaction with the public, and legitimate journalistic purpose distinguish this case from any legitimate application of Section 102-74.390. The government's prosecution violates clearly established First Amendment precedent and cannot survive constitutional scrutiny.

The regulation's application to Mr. Reardon's conduct fails every constitutional test: it restricts protected expression in a traditional public forum, discriminates based on the content of his criticism, lacks narrow tailoring to serve legitimate

governmental interests, and provides inadequate notice of prohibited conduct.

WHEREFORE, defendant Matthew Reardon respectfully requests that this Court grant his Motion to Dismiss the Bill of Information and dismiss all charges against him.

RESPECTFULLY SUBMITTED,

REBECCA L. HUDSMITH
Federal Public Defender

BY:    *s/ Dustin C. Talbot*
        DUSTIN C. TALBOT
        Appellate Chief
        Federal Public Defender's Office
        Middle and Western Districts of Louisiana
        102 Versailles Boulevard, Suite 816
        Lafayette, Louisiana 70501
        Telephone: (337) 262-6336

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 6, 2025, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*