UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO.  6:25-CR-00227-01** |
| **VERSUS** | |
| **MATTHEW REARDON (01)** | **MAGISTRATE JUDGE LEBLANC** |

### REASONS FOR JUDGMENT

The United States charged Defendant Matthew Reardon by Bill of Information with one count of violating 41 C.F.R. § 102-74.390 (a)-(b), based on conduct that occurred on August 25, 2025, at the John M. Shaw United States Courthouse in Lafayette, Louisiana.  The case was tried to the court on December 15–16, 2025.  At the conclusion of the Government's case, Reardon moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 based on a lack of sufficient evidence presented at trial that (i) the events took place on federal property, and (ii) that Reardon created an obstruction of the usual use of an entryway.  The court reserved ruling on Reardon's Rule 29 motion.  Reardon renewed the motion at the close of evidence.  For the reasons that follow the motion for acquittal, as renewed, [docs. 53 & 55] is **DENIED**, and defendant is adjudged **GUILTY**.

#### FINDINGS OF FACT

Reardon paid three visits to the John M. Shaw United States courthouse (the "Courthouse") in Lafayette, Louisiana in the summer of 2025, to determine whether his constitutional rights would be violated by interactions with personnel there.  Reardon considers himself a First Amendment "auditor," a term known to himself and law enforcement witnesses.  He conducts

independent investigative journalism work by visiting public buildings and documenting what public employees do, how they conduct themselves and whether they violate his constitutional rights. In doing so, he records his visits by camera to create an accurate record of events as he experiences them. He shares these videos with his online audience, sometimes live streaming interactions.[1] He made video recordings of each visit to the Courthouse.

A description of the physical layout of the front of the Courthouse is appropriate to understand the events at issue. *See generally* Gov't Ex. 14 (photograph of the front of the Courthouse). The Courthouse faces Lafayette Street in downtown Lafayette, Louisiana. Beginning at the street and moving toward the Courthouse, a public sidewalk runs adjacent to Lafayette Street and extends from the curb of the street to a set of concrete bollards. A paved concrete area the width of the Courthouse extends from the concrete bollards to the foot of the steps that lead to the entrance area of the Courthouse. At the foot of the steps are metal barricades that have been placed to prevent access to the Courthouse steps. At the top of the steps, there is an uncovered landing area. The uncovered landing area is bounded on each side by raised platforms with statues on them. The landing eventually reaches a colonnade supporting the overhang of the second story of the Courthouse and transitions into a covered area between the colonnade and the exterior entrance doors. This covered area is referred to as the porch or portico. Instead of using the steps to access the Courthouse, visitors use ramps on either side of the portico. Beyond the exterior entrance into the building is a foyer that leads to the interior entrance doors. Once through the interior entrance doors, visitors are in the unsecured lobby of the Courthouse with a set of turnstiles directly in front and a security screening station to the left. The turnstiles

---

[1] Much of the information in this paragraph is derived from Reardon's testimony given in his case-in-chief in this matter and so was not evidence presented by the Government and available to the court at the time of the Rule 29 motion. It is recounted here for context but is not considered by the court as substantive evidence as to any of the elements of the charged offense.

are for exiting only. Beyond the turnstiles is the secured lobby or atrium, which includes the elevators and stairs to access other floors of the Courthouse as well as access points to other offices that are located on the first floor. To gain access to the balance of the Courthouse, visitors must proceed through the security screening station, which routes persons around the turnstiles and into the atrium. The unsecured lobby and the atrium are one large space, physically divided only by the turnstiles.

With respect to the entrances, the exterior entrance is comprised of five sets of glass double doors and two sets of windows. Facing the front of the Courthouse, and from left to right the exterior entrance is configured as follows: a set of doors that cannot be accessed from the outside but are operated by a push bar from the inside for exiting; a set of windows; a set of doors that are designated as an emergency exit ("EE-1 Door"); a set of doors that are designated as an emergency exit ("EE-2 Door"); a set of doors designated as the main entrance and exit doors (the "Entrance/Exit Door"); a set of windows; and a set of doors that cannot be accessed from the outside by the public but are operated by a push bar from the inside for exiting. The EE-2 Door is in the center of the exterior entrance area. The two emergency exits remain locked, but court security personnel are readily available to unlock them should the need arise. All of these doors open outwardly into the portico. The interior entrance is again a bank of glass doors and windows, with the center doors remaining open to permit access into the lobby.

Reardon first visited the Courthouse on June 23, 2025.[2] His purpose in visiting the Courthouse was to determine if he, as a professed independent journalist, would be allowed to conduct journalistic activities (i.e., video recording) in the unsecured portions of the building,

---

[2] The discussion of Reardon's first visit to the Courthouse is based upon his own video of the events of that day. Two versions of this video were introduced into evidence, Government Exhibit 2 and Defendant's Exhibit 3. Both exhibits were introduced in the course of the testimony of Deputy United States Marshal in Charge John Farrish during the Government's case-in-chief.

consistent with his understanding of the Rules and Regulations Governing Conduct on Federal Property, promulgated by the Secretary of Homeland Security in consultation with the Administrator of General Services (the "GSA Conduct Rules").[3]  Specifically, the provision governing news-related photography (the "News Provision") is found at 41 C.F.R. § 102-74.420:

> **What is the policy concerning photographs for news, advertising, or commercial purposes?**
> Except where security regulations, rules, orders, or directives apply or a Federal court order or rule prohibits it, persons entering in or on Federal property may take photographs of—
> (a) Space occupied by a tenant agency for non-commercial purposes only with the permission of the occupying agency concerned;
> (b) Space occupied by a tenant agency for commercial purposes only with written permission of an authorized official of the occupying agency concerned; and
> (c) Building entrances, lobbies, foyers, corridors, or auditoriums for news purposes.

41 C.F.R. § 102–74.420.

Reardon entered the Courthouse foyer through the Entrance/Exit Door and veered to his left to enter the unsecured lobby through the open center interior door, video recording as he proceeded.  Positioned in the foyer between the Entrance/Exit Door and the open center interior door is a stand-alone signpost containing a placard entitled "Rules and Regulations Governing Conduct on Federal Property" which sets forth pertinent provisions of the GSA Conduct Rules (the "GSA Conduct Rules Poster"). Defendant's Ex. 3; Gov't Ex. 16.  The signpost is positioned such that Reardon walked right past it to enter the Courthouse lobby.  Defendant's Ex. 3.  This signpost and the GSA Conduct Rules Poster on it were the focal point of his visit to the Courthouse that

---

[3] The GSA Conduct Rules are adopted pursuant to 40 U.S.C. § 1315(c), which confers authority on the Secretary of Homeland Security to prescribe regulations with penalties limited to a fine and/or thirty days imprisonment corresponding to a class C misdemeanor, per 18 U.S.C. § 3559(a)(8).  The GSA is the "U.S. General Services Administration, acting by or through the Administrator of General Services."  41 C.F.R. § 102-71.10.

day.  In addition to this signpost, additional signs are posted outside the Courthouse and at the security station advising that electronic devices are prohibited inside the Courthouse.

Upon entering the lobby, Reardon was met by a Court Security Officer who advised him that videoing in the Courthouse was not permitted.  Readon advised the CSO that he was "stress testing a right" by videoing in the unsecured area of the lobby and explained that he travels all around the country doing this and has "been in enough courthouses to know" what his rights are.  The CSO retreated to the screening station and sought assistance from the United States Marshals Service to address Reardon's actions.  While awaiting the arrival of Deputy United States Marshal in Charge John Farrish, Reardon inquired of another CSO at the screening station: "Where are your rules governing conduct on federal property?"  The CSO pointed to the signpost in the foyer, and Reardon walked out to it.  Reardon then videoed the GSA Conduct Rules Poster to publish its contents to his viewers.  Doing so, he commented that "[i]t's the same thing as Poster 7 at the Post Office."  Continuing, he advised his viewers "[t]his is supposed to be posted at every federal building," and this is "nothing new."

Reardon then returned to the lobby, and Deputy Marshal Farrish arrived and approached him.  When Deputy Marshal Farrish asked Reardon for his name, Reardon identified himself as Don Matthews, a pseudonym he has used.  In his interaction with Deputy Marshal Farrish, Reardon reiterated that by videoing in the unsecured lobby area he was conducting "a stress test of a constitutional right" and that he travels around the country doing so.  He escorted Deputy Marshal Farrish to the foyer and pointed out the GSA Conduct Rules Poster, and specifically the News Provision set forth on that poster.  Eventually Deputy Marshal Farrish stepped away to further assess this situation.  Continuing with his efforts, Reardon returned to the GSA Conduct Rules Poster and, while videoing the poster again and the News Provision specifically, proclaimed:

"Could it be any clearer than this?  Rules and Regulations Governing Conduct on Federal Property."  Minutes later, Reardon once again returned to the GSA Conduct Rules Poster and, while videoing it, stated:  "This sign right here, before you even walk into the federal courthouse.  It is the same exact thing as Poster 7 in the Post Office.  Every federal building has to have it."  From these events, two things may be concluded:  (1) the GSA Conduct Rules Poster was conspicuously posted at the Courthouse and Reardon had full knowledge of its existence and placement, and (2) Reardon was fully on notice as to the existence and import of the GSA Conduct Rules, whether or not he ever chose to acquaint himself with any provision other than the News Provision.

Reardon's efforts on this day lasted for just more than an hour.  This prolonged interaction involved Court Security Officers, the United States Marshals Service, and city police.  Throughout, Reardon continually insisted on his right as a journalist to film in the Courthouse lobby.  Deputy Marshal Farrish eventually ordered the Courthouse closed approximately 15 minutes early and escorted Reardon from the building.

Reardon returned to the courthouse on June 26, 2025, to file a complaint about Deputy Marshal Farrish, and he again filmed the interaction.  *See generally* Gov't Ex. 3.  Deputy Marshal Farrish greeted Reardon in the lobby.  Reardon advised Deputy Marshal Farrish that his complaint was "that honestly you [Deputy Marshal Farrish] didn't know your rules and regulations governing conduct on federal property."  Deputy Marshal Farrish asked Reardon to accompany him into the foyer to review the GSA Conduct Rules Poster, as there seemed to be a difference of opinion as to their application, and Reardon refused shouting, "I showed you the rules."

Deputy Marshal Farrish informed Reardon that they do not take complaints at the Courthouse, but that he could contact the Department of Justice to make a complaint.  Deputy

Marshal Farrish made a point of addressing Reardon by his real name, not the pseudonym he had provided in their first interaction, leading Reardon to believe that the United States Marshals Service ("USMS") may have begun investigating him after his first visit to the Courthouse.

Reardon returned to the Lafayette courthouse on August 25, 2025, determined to exercise his rights under the First Amendment to the United States Constitution and to express his "extreme discontent" with the USMS. By way of a Freedom of Information Act Request, Reardon had learned the USMS had been in contact with other law enforcement agencies about him and had placed a "be on the lookout" or BOLO on him, which actions impassioned him that day. As before, Reardon had cameras in hand and videoed the events of the day. *See generally* Gov't Ex. 12.

Reardon arrived at the Courthouse on August 25, 2025, with a camera on a tripod and two smartphones. He arranged these devices in the area of the sidewalk in front of the Courthouse to capture his protest efforts. In addition to this equipment, Reardon had multiple posters, handwritten on foam posterboard, criticizing the USMS and employing expletives to do so. Reardon then meandered for a period of time between the sidewalk and the paved concrete area on the courthouse-side of the bollards exhibiting his posters to passers-by.

After protesting near the street for a period, Reardon observed one of the Deputy Marshals make a gesture from inside the Courthouse that Reardon interpreted as an invitation to enter the Courthouse. He gathered his belongings and made his way to one of the ramps leading to the portico, all the while explaining to his audience that he had been invited into the Courthouse. Upon arriving on the portico, Reardon set his tripod and camera between two of the columns of the colonnade facing the EE-1 Door. He attempted to enter the Courthouse through the EE-2 Door then the EE-1 Door, finding both to be locked. He then made his way to the Entrance/Exit Door with posters under his arm and a video-recording device operating.

As Reardon came through the Entrance/Exit Door and was approaching the open center door of the interior entrance, he was met by Deputy United States Marshal Hayden Nugent, who had been present for Reardon's two previous visits. Deputy Nugent informed Reardon that he had not been invited inside the Courthouse and that he would be arrested if he attempted to film inside the Courthouse. Reardon, believing he had been duped into entering the Courthouse, began loudly protesting Deputy Marshal Nugent in expletive-laden language as he exited the building. Instead of returning to the sidewalk, however, Reardon resumed his protest under the portico, noting to his audience, "now they just asked for it" and "there's a big part of me that wants to go back in and take the arrest." He continued: "They want it. They want it."

After exiting the Courthouse, Reardon began to "hang some signs," lamenting that he should have brought tape. Several times, he displayed a 20- by 30-inch posterboard to those inside by holding the posterboard against or directly in front of the EE-1 Door, the EE-2 Door and the Entrance/Exit Door, obstructing the view through those doors when he did so. While holding a posterboard up to one of the emergency exit doors, he greeted a visitor to the courthouse by calling out "Happy F*** the U.S. Marshals Day!" (using the expletive). Shortly thereafter, he stationed himself with the posterboard in front of the Entrance/Exit Door for approximately 20 seconds, at one point propping the poster on the pair of door handles for that set of doors, blocking its use entirely.

Reardon then moved the tripod and camera from where he had left it between columns and positioned it directly in front of the EE-2 Door with at least one of the feet of the tripod touching the door and the mounted camera "recording right against the glass." He then made his way down the portico to the right of the EE-2 Door, past two more sets of doors and a set of windows, eventually taking his place on the statue platform at that end of the landing area. At this point, he

was quite a distance away from the tripod and camera, and his protest and videoing activities directed his attention away from the area of the EE-2 Door where that equipment was left.

Reardon had been conducting his protest activities from the statue platform for about 20 minutes when Deputy Marshal Nugent and another Deputy United States Marshal exited the building and approached him. Deputy Marshal Nugent directed Reardon to remove the camera blocking the emergency exit door, advising it presented a hazard and warning that it would be seized otherwise. Reardon refused to move the camera, telling Deputy Marshal Nugent "you need to suck my d**k!" In response, Deputy Marshal Nugent advised Reardon he was seizing the camera and tripod and then turned and started to walk toward the equipment. At this point, being a good distance away from the equipment, Reardon quickly moved toward it, yelling a warning at Deputy Marshal Nugent not to touch it. Upon both arriving at the tripod and camera, Deputy Marshal Nugent directed Reardon to move the camera to the far side of the metal barricades on the sidewalk below, and Reardon protested that "I'm fine right here." Deputy Marshal Nugent stated that he would be arrested if he did not comply and gave a three second countdown before arresting Reardon and taking him into custody when he refused to do as instructed.

As a consequence of the events on August 25, 2025, Reardon was charged with violating the GSA Conduct Rules, specifically 41 C.F.R. § 102–74.390. It reads:

> **What is the policy concerning disturbances?**
>
> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct, or exhibiting other conduct on property that—
>     (a) Creates loud or unusual noise or a nuisance;
>     (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;
>     (c) Otherwise impedes or disrupts the performance of official duties by Government employees; or
>     (d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

41 C.F.R. § 102–74.390 (the "Disturbance Provision"). Reardon was charged with violating the first two subsections, which prohibit visitors from creating loud or unusual noise or a nuisance and from unreasonably obstructing the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots. The Government proceeded on only the subsection (b) charge, concerning the obstruction of entrances.

## ANALYSIS

To establish a violation of subsection (b) of the Disturbance Provision, the Government must prove that (1) the incident occurred on federal property; (2) the defendant exhibited conduct that unreasonably obstructed the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; and (3) the defendant acted with the appropriate *mens rea*, or knowledge that the action was unlawful. *United States v. Cruscial*, No. 3:18-CR-00465-JR, 2019 WL 1087150, at *6 (D. Or. Mar. 7, 2019); *United States v. Radin*, No. 16-CR-528 (RJS), 2018 WL 1384514, at *4 (S.D.N.Y. Mar. 18, 2018), *aff'd,* 821 F. App'x 53 (2d Cir. 2020). Additionally, because federal agencies are charged with observance of the GSA Conduct Rules, 41 C.F.R. § 102-74.365, and because those rules "shall be posted and remain posted in a conspicuous place on the property," 40 U.S.C. § 1315(c), the Government must also establish that the defendant was on notice that his conduct was prohibited, either because the GSA Conduct Rules were posted in a place "reasonably calculated to impart" their prohibitions, or because defendant had actual knowledge of the prohibition by verbal warning or the like. *See United States v. Strakoff*, 719 F.2d 1307, 1310 (5th Cir. 1983); *United States v. Bichsel*, 395 F.3d 1053, 1056 (9th Cir. 2005).

In his motion for judgment of acquittal, Reardon argued that the government presented insufficient evidence that the events took place on federal property, as well as insufficient evidence that Reardon created an obstruction of the usual use of an entryway. Under Rule 29 of the Federal

Rules of Criminal Procedure, when a defendant moves for acquittal at the close of the government's case and the court reserves judgment, as was done here, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

**1. The incident occurred on federal property.**

Although the GSA Conduct Rules do not define "federal property," the rules "apply to all property under the authority of the General Services Administration (GSA) and to all persons entering in or on such property." 41 C.F.R. § 102-74.365; *United States v. Radin,* 821 F. App'x 53, 54 (2d Cir. 2020); *see also* 20 U.S.C. § 107e. ("'Federal property' means any building, land, or other real property owned, leased, or occupied by any department, agency, or instrumentality of the United States . . ."). The GSA Conduct Rules were promulgated pursuant to 40 U.S.C. § 1315, which empowers the Secretary of Homeland Security to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof)." 40 U.S.C. § 1315. Evidence that the Courthouse is owned, leased, or occupied by United States governmental agencies and under the authority of the GSA is therefore relevant to the inquiry as to whether the incident took place on federal property. *Radin*, 2018 WL 1384514, at *4.

During the Government's case in chief, Deputy Marshal Farrish testified to his understanding that the Courthouse is under the authority of the GSA, and that in addition to housing the United States District Court for the Western District of Louisiana, the building's tenants include the GSA, the United States Probation Office, the United States Bankruptcy Court, and the United States Marshals Service. He further testified that GSA regulations govern what individuals can and cannot do in the Courthouse, and the court reviewed video evidence taken

11

from Reardon's first visit to the Courthouse, showing that the GSA Conduct Rules were posted in the foyer of the Courthouse on a stand just inside the designated entrance.

This evidence is sufficient to prove beyond a reasonable doubt that the incident took place on federal property, within the meaning of the GSA Conduct Rules. An individual charged with court security is competent to attest that federal business is conducted on the property. *See Moore v. United States*, 254 F. App'x 603, 604 (9th Cir. 2007). Deputy Marshal Farrish testified that the Courthouse is under the authority of the GSA and that multiple federal agencies are tenants in the building. Moreover, the undisputed fact that the GSA Conduct Rules were posted in the foyer is itself evidence that the building is under GSA authority, *id.*, as those rules must be posted "in a conspicuous place" on "property owned or occupied by the Federal Government." 40 U.S.C. § 1315(c)(1). Accordingly, the first element is satisfied.

**2. The defendant exhibited conduct prohibited by the Disturbance Provision.**

Evidence introduced at trial proves beyond a reasonable doubt that defendant Reardon exhibited conduct that unreasonably obstructed the usual use of the entrance to the Courthouse, satisfying the second element of the offense.

In the Lafayette Courthouse, the entrance is made up of a bank of glass double doors that separate the exterior columned portico from the interior foyer to the building. Only one of these double doors, the Entrance/Exit Door, is customarily left unlocked during business hours for the arrival of visitors. The other doors are designated either as exits, which can be pushed from the inside, or as emergency exits, which are customarily left locked but can be unlocked quickly by security personnel if needed. An emergency is by definition a sudden and unforeseen occurrence that requires immediate action. As such, an emergency exit, to serve its function, cannot be impeded at any time.

As may be seen from the photographic evidence in this case, the entrance to the Courthouse is not merely a door or set of doors, it is a transitional space that physically, architecturally, and symbolically separates the interior of the Courthouse from the everyday activity going on outside. Deputy Marshals Farrish and Nugent testified that the entrance area is arranged to allow security personnel maximum opportunity to observe visitors as they approach, so there is a security-related purpose to the way the entrance has been arranged, including which doors are open to visitors, and the placement of the security station to maintain a line of sight to the Entrance/Exit Door and to the outside through the various glass doors and windows. Emergency exits are part of this security system, insofar as they could be used to allow swift and safe evacuation of the building in an emergency. The court also takes judicial notice that the entrances to courthouses are generally designed to signal to visitors that they are entering a special, serious, and frequently silent place, devoted to the administration of justice. *See Hodge v. Talkin*, 799 F.3d 1145, 1150 (D.C. Cir. 2015) (quoting Justice Breyer's *Statement Concerning the Supreme Court's Front Entrance* and describing the U.S. Supreme Court Plaza as "the opening stage of 'a carefully choreographed, climbing path that ultimately ends at the courtroom itself.'"). The court therefore reads "obstructs the usual use of entrances" to also encompass conduct that impedes, impairs, and obstructs the use of the Courthouse entrance in this broader sense: as an entrance system that has security, safety, and symbolic functions, as well as the purely practical function of allowing visitors to come and go.

Photos and videos introduced into evidence show that Reardon placed a camera on a tripod directly in front of one of the emergency exit doors, one of its legs touching the door and the camera recording "against the glass," obstructing the door's potential use as an emergency exit. He then left the tripod unattended for about 20 minutes while he moved to the far end of the landing

13

onto a statue platform with his attention directed to other pursuits and away from the equipment. Reardon was only prompted to return to the tripod and camera because law enforcement confronted him and advised it would be seized if not moved. He also stood directly in front of other doors, including the designated entrance door, holding a posterboard against the glass, thereby obstructing the view from inside the building and physically blocking the doors. At one point, he propped one such posterboard on the handles of the Entrance/Exit Door where the double doors meet, simultaneously impeding both doors.

Reardon's actions obstructed the usual use of the Courthouse entrance in three ways. He obstructed the use of these doors as doors by placing himself and his camera equipment in front of the doors for a prolonged period with no apparent purpose other than to provoke a response from security personnel. He also obstructed the use of the doors as a means for security personnel to observe the building's exterior through the glass by partially covering the glass doors with posterboard. And he interfered with and disrupted the usual use of the Courthouse's entrance as a dignified transitional space that befits the importance of business conducted within.

**3. The defendant had the appropriate state of mind to be found culpable.**

The Disturbance Provision "is silent as to the *mens rea* required to commit the offense;" in other words, the regulation does not describe the culpable state of mind required for an offense to have occurred. *United States v. Wasylyshyn*, 979 F.3d 165, 174 (2d Cir. 2020). Nonetheless, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence[,]" and courts generally impute a *mens rea* requirement into such silent statutes, consistent with legislative intent and common law. *Staples v. United States*, 511 U.S. 600, 605 (1994) (internal quotation marks omitted, alteration added). "When interpreting federal criminal statutes that are silent on the required mental state," courts "read into the statute

14

'only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct.'" *Elonis v. United States*, 575 U.S. 723, 736 (2015) (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)) (internal quotation marks omitted).

Courts considering actions prohibited by the GSA Conduct Rules have concluded that, to have the requisite *mens rea*, a defendant must generally know the facts that make his conduct fit the definition of the offense, even if he does not know that the facts constitute a crime. *United States v. Zagorovskaya*, 628 F. App'x 503, 504 (9th Cir. 2015); *Cruscial*, 2019 WL 1087150, at *4 n. 5; *United States v. Brice*, 926 F.2d 925, 930 (9th Cir. 1991) ("The purpose of ensuring the normal functioning of federal facilities is best served by construing [predecessor regulation] as a general intent crime.")  To convict Reardon of violating the Disturbance Provision, the Government must prove that he had knowledge he was unreasonably obstructing the usual use of entrances, not that Reardon knew of a specific regulation proscribing his conduct. *Wasylyshyn*, 979 F.3d at 174.

Several factors demonstrate that Reardon possessed the requisite state of mind to have knowingly violated the Disturbance Provision. After the brief exchange in which Deputy Marshal Nugent advised Reardon he would be arrested if he attempted to film inside the Courthouse, instead of returning to the sidewalk, he chose to remain near the Courthouse entrance. At that point, he chose to move his tripod from the area in the portico where he had initially placed it that was several feet away from the doors. He repositioned the tripod and camera closer to the center of the bank of doors, placing a foot of the tripod against of one of the emergency exit doors, and setting the camera "against the glass" to record—or at least appear to record—the interior of the Courthouse that he had repeatedly been warned was off-limits to filming. As he videoed the entire episode, he spoke to his audience multiple times of standing his ground and "taking the arrest," suggesting actions that were purposeful rather than unintentional. When finally confronted by law

enforcement and directed to move his tripod and camera because it was a hazard, Reardon initially refused and berated the officer. Taken together, this conduct establishes beyond a reasonable doubt deliberate and intentional behavior consistent with a general intent to perform the actions that constituted a violation of the Disturbance Provision. The third element is satisfied.

### 4. The defendant was on notice that GSA Conduct Rules prohibited his conduct.

Courts applying the Disturbance Provision at 41 C.F.R. § 102-74.390 have interpreted it to require that a defendant be placed on notice that his conduct is illegal before being arrested. The notice rule arises from the statutory requirement that the GSA Conduct Rules "shall be posted and remain posted in a conspicuous place on the property" under the GSA's authority. 40 U.S.C. § 1315(c). *See Strakoff*, 719 F.2d at 1310. As one court aptly summarized the application of this notice requirement:

> Appellant's conduct was loud, disruptive, offensive, and inappropriate to a federal courthouse. Members of the public, court users, and court staff all have a right to be free from such conduct. If the Government had publicly posted a copy of 41 C.F.R. § 102–74.390 as required by regulation, CSO Wilson would have had the authority to arrest Appellant. Similarly, had Appellant continued his conduct after being told that it would lead to his arrest, that too would have given CSO Wilson the authority to arrest him. But in the absence of evidence that the Government complied with its notice obligations, Appellant's conviction must be reversed.

*United States v. Marotz*, 75 F. Supp. 3d 1167, 1172–73 (N.D. Cal. 2014).

Thus, to enforce the GSA Conduct Rules via criminal penalty, the Government must establish that defendant was on notice that his conduct was prohibited, either because the GSA Conduct Rules were posted in a place "reasonably calculated to impart" their prohibitions, or because defendant had actual knowledge of the relevant prohibition. *See Strakoff*, 719 F.2d at 1310 (absent a showing that defendant had actual notice as to regulation prohibiting possession of firearm on federal property, his conviction could not stand if the regulation was not posted in a "conspicuous place"); *United States v. Cebreros*, 778 F. App'x 547, 548 (9th Cir. 2019) (if posting

16

the GSA Conduct Rules is a required element of offense, that element is satisfied by actual notice that conduct is illegal); *United States v. Strong*, 724 F. 3d 51 (1st Cir. 2013) (conspicuous posting of GSA Conduct Rules satisfied notice requirement, despite lack of verbal warning, where defendant admitted awareness that spreading feces around a public bathroom is wrong); *Bichsel*, 395 F.3d at 1056 (defendant was on sufficient notice that conduct was prohibited, even though GSA Conduct Rules were not posted where he could see them, because he received repeated verbal warnings that he would be arrested he did not cease); *Marotz*, 75 F. Supp. 3d at 1172 (requiring either conspicuous posting of GSA Conduct Rules or actual notice as described in *Bichsel*).

In this case, there is no dispute that the GSA Conduct Rules were conspicuously posted in the foyer of the courthouse, just inside the main entrance door. Like the News Provision Reardon so adamantly championed, the Disturbance Provision also appears on the GSA Conduct Rules poster.[4] It is undisputed that Reardon was aware that the GSA Conduct Rules were conspicuously posted at the Courthouse, as he both filmed them and drew security and police officers' attention to them multiple times during his first visit to the Courthouse. The notice requirement is therefore satisfied.

## CONCLUSION

The court returns to Defendant's Motion for Judgment of Acquittal, which was made at the close of the Government's case and renewed at the close of evidence. In ruling on this motion, a district court must determine whether the relevant evidence, viewed in a light most favorable to the Government, could be accepted by a jury as adequate and sufficient to support the conclusion

---

[4] A copy of the GSA Conduct Rules Poster was introduced into evidence as Government's exhibit 16. It contains four columns of text, with the News Provision at the bottom of the third column and the Disturbance Provision at the top of the second column. The section heading of the Disturbance Provision on the poster is slightly different from the heading appearing in the Code of Federal Regulations. On the poster, the heading reads "Disturbances (41 CFR 102-74.390)." The text of the Disturbance Provision is otherwise identical to the regulation quoted previously herein, with slight differences in punctuation.

of the defendant's guilt beyond a reasonable doubt. *United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir. 1980). The court finds that the evidence presented at the time the ruling was reserved was not "insufficient to sustain a conviction." Fed. R. Crim. P. 29 (a). To the contrary, the Government satisfied its obligations in the case in chief, in large part because the video recordings of Reardon's visits to the Courthouse provided evidence as to Reardon's obstruction of the exits, state of mind, and the notice requirement. Additionally, as stated above, the Government's first witness, Deputy Marshal Farrish, was competent to testify that the Courthouse was federal property, within the meaning of the GSA Conduct Rules, on the date of the offense. Accordingly, the Motion for Judgment of Acquittal is **DENIED.**

Reardon chose to testify in his defense. His testimony, however, does not dissuade the court from its findings in this case. To the contrary, Reardon's testimony confirmed that he was aware of the existence of the GSA Conduct Rules and had observed the GSA Conduct Rules Poster at the Courthouse on his first visit. He acknowledged that he could not block exits and entrances to the Courthouse and admitted to placing his camera and tripod, signs and his body against multiple doors on August 25, 2025. Reardon believed that obstructing a locked door or one that no member of the public was attempting to use at the time of his actions was not "obstruct[ing] the usual use." As previously explained, the doors at issue serve a multitude of purposes in the setting of this Courthouse, such that Reardon's narrow view that "usual use" means only actual use when a person is entering or exiting is simply untenable. He also admitted that, in conducting his "investigative journalism" and acting as a "First Amendment Auditor" his goal is to gain "standing" to challenge conduct he believes is violative of his constitutional rights, which "standing" he stated could only be gained by being arrested or receiving a threat of arrest. Reardon testified court personnel "miserably failed the First Amendment test" on his first visit such that

there "has to be a follow up." Thus, as his testimony and the video evidence demonstrates, Reardon believed his rights had been violated on his first visit to the Courthouse, and so his return visits were motivated, at least in part, to earn him "standing"—i.e., he was intent on provoking his arrest or the threat of it.

Based on the foregoing, the court concludes the Government has proven beyond a reasonable doubt all the essential elements to establish Reardon's violation of the Disturbance Provision, and so Reardon is adjudged **GUILTY**.

**SO ORDERED** at Lake Charles, Louisiana, this 16th day of January, 2026.

_____
**THOMAS P. LEBLANC**
**UNITED STATES MAGISTRATE JUDGE**