UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO:   6:25-CR-00227-01 |
| VERSUS | |
| MATTHEW REARDON | MAGISTRATE JUDGE LEBLANC |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS THE BILL OF INFORMATION
UNDER THE FIRST AMENDMENT**

NOW INTO COURT, through the undersigned counsel, comes Defendant Matthew Reardon, who respectfully submits this supplemental memorandum following the Court's Reasons for Judgment entered January 16, 2026. Following a bench trial on December 15-16, 2025, this Court adjudged Mr. Reardon guilty of violating 41 C.F.R. § 102-74.390(b) for allegedly unreasonably obstructing the usual use of entrances at the John M. Shaw United States Courthouse. The government abandoned prosecution under subsection (a) concerning noise or nuisance and proceeded only on the obstruction charge under subsection (b).

Mr. Reardon respectfully preserves the constitutional objections raised in his original Motion to Dismiss and Reply Memorandum, and supplements those arguments in light of this Court's factual findings. While Mr. Reardon respects this Court's factual determinations, he maintains that even accepting those findings, the prosecution and conviction violate the First Amendment under clearly established Supreme Court and Fifth Circuit precedent. This supplemental memorandum

addresses how the Court's specific findings strengthen the constitutional analysis previously briefed.

## I. SUPPLEMENTAL ARGUMENT

### A. The Court's Findings Confirm a Petition Clause Violation Under *United States v. Hylton*

The Court's factual findings place Mr. Reardon's conduct squarely within the protection established by the Fifth Circuit in *United States v. Hylton*, 710 F.2d 1106 (5th Cir. 1983). The Court found that Mr. Reardon sought to gain "standing" to challenge perceived constitutional violations through his courthouse protest. Doc. 62 at 18-19. This finding confirms that Mr. Reardon's conduct constituted classic petition clause activity—seeking governmental action to address grievances against federal officials.

The Fifth Circuit in *Hylton* declared that even where a defendant's actions were motivated by a desire to impede government agents, the defendant's conduct remained "a legitimate and protected exercise of her right to petition for the redress of grievances." 710 F.2d at 1111. The court emphasized that "the possibility that a citizen who feels himself to have been abused by a particular federal official may take satisfaction when the official gets his perceived due is too human for First Amendment protection to depend on its absence." *Id.* at 1112. The Fifth Circuit held this protection applies regardless of the petitioner's subjective motivations or the potential effect on government officials.

Here, Mr. Reardon's conduct exemplifies textbook petition clause exercise. The

2

Court's findings establish that he first went to the courthouse to "conduct journalistic activities (i.e., video recording) in the unsecured portions of the building." Doc. 62 at 3. He was ordered to leave the courthouse and the courthouse was closed early that day in response to his "journalistic activities." Doc. 62 at 6. He returned to the courthouse a second time and attempted to file an official complaint with the U.S. Marshals Service about this targeting, but was turned away by Deputy Marshal Farrish and told to file his complaint in Washington D.C. Doc. 62 at 6-7. In response to these interactions, he filed FOIA requests that revealed U.S. Marshal surveillance targeting his journalistic activities. Doc. 62 at 7. When traditional administrative channels were closed to him, Mr. Reardon exercised his constitutional right to petition through public protest.

The Court found that Mr. Reardon returned to the courthouse with signs expressing his grievances against the U.S. Marshals Service, that he livestreamed his protest to bring public attention to his petition for redress, and that he documented the government's response through his journalism platform, We the People News. Doc. 62 at 7-8. This sequence represents the archetypal exercise of petition clause rights: seeking official governmental action through formal administrative channels and, when denied access, turning to public protest and journalistic documentation to seek redress of grievances.

The Court's finding that Mr. Reardon expressed "extreme discontent" with government officials, Doc. 62 at 7, places his conduct at the core of petition clause

3

protection. The Supreme Court has recognized that the right "to petition for a redress of grievances" is "among the most precious of the liberties safeguarded by the bill of rights." *United Mineworkers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222 (1967). This protection extends specifically to grievances against government officials and encompasses both formal and informal petitioning activities.

Under *Hylton*, the government cannot criminalize petition activities simply because they occur near government facilities or because they seek to create pressure for official accountability. The Fifth Circuit specifically rejected arguments that petition activities lose protection when directed at the same officials who might enforce laws against the petitioner. Here, the Court's findings establish that Mr. Reardon engaged in precisely the kind of grievance-seeking conduct that *Hylton* protects, making this prosecution a clear violation of established Fifth Circuit precedent.

### B. The Prosecution Criminalized Protected Newsgathering Activities Using Journalistic Tools

#### 1. The Camera Equipment Constituted Protected Newsgathering Tools

The Court's findings confirm that the object allegedly creating obstruction was Mr. Reardon's camera—a fundamental tool of journalistic newsgathering. Doc. 62 at 8-9. The Court found that Mr. Reardon positioned his camera to record his protest for his journalism platform, We the People News. *Id.* at 7-8. This prosecutes the very

4

equipment essential to constitutionally protected press activities and "muzzles one of the very agencies [the Press] the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills v. State of Ala.*, 384 U.S. 214, 219 (1966).

The positioning of recording equipment to document newsworthy events constitutes protected First Amendment activity. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated"); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest"); *Chicago Headline Club v. Noem*, No. 25 C 12173, --- F.Supp.3d ----, 2025 WL 3240782, at *78 (N.D. Ill. Nov. 20, 2025) ("the First Amendment protects non-violent newsgathering"). The government's prosecution of camera placement criminalizes the essential tools of journalism in a traditional public forum.

The Court found that Mr. Reardon engaged in "investigative journalism" and acted as a "First Amendment Auditor" seeking to document government responses to constitutional challenges. Doc. 62 at 18. These activities represent core newsgathering functions that receive heightened constitutional protection. *See Mills*, 384 U.S. at 219 ("Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people

5

whom they were selected to serve."). The government cannot criminalize the placement of recording equipment necessary for documenting government conduct without violating clearly established press freedom precedent.

### 2. Mr. Reardon Was Never Prohibited from Recording in the Portico Area Despite Multiple Prior Visits

Critically, the trial evidence and Court's findings establish that through three separate courthouse visits spanning two months, Mr. Reardon was never told he could not record in the portico area. The record demonstrates that government warnings consistently focused on recording *inside* the courthouse, not in the exterior portico where the alleged obstruction occurred.

During his first visit on June 23, 2025, security officers advised that "recording devices were not permitted on federal property" but directed him to "stop recording and return the devices to his vehicle" only after he was inside the courthouse lobby. Doc. 62 at 3, 6. During his second visit on June 26, 2025, he was told that "loitering in the lobby, recording on federal property" was prohibited, again referencing interior courthouse areas.

Most significantly, on August 25, 2025—the day of his arrest—Mr. Reardon was only "informed that he had not been invited inside the Courthouse and that he would be arrested if he attempted to film *inside* the Courthouse." Doc. 62 at 8 (emphasis added). Deputy Marshal Nugent, who had been present for Mr. Reardon's two previous visits, specifically limited the recording prohibition to activities *inside* the courthouse building.

6

This pattern of warnings establishes that the government consistently distinguished between prohibited recording inside the courthouse and permissible activities in the exterior portico area. Having never been told he could not record in the portico during two prior visits and extensive discussions with court security personnel and marshals, Mr. Reardon reasonably understood that exterior portico recording was permissible. The government cannot now criminalize conduct it never prohibited through its prior interactions spanning multiple visits.

### 3. Mr. Reardon Complied with the Directive to Move His Camera But Was Still Arrested

The Court's findings establish that when finally directed to move his camera, Mr. Reardon complied with the government's directive but was arrested nonetheless. While the Court found that Mr. Reardon used "boisterous" conduct and "expletive-laden language" during this interaction, Doc. 62 at 8-9, it also found that when confronted by Deputy Marshal Nugent, Mr. Reardon "quickly moved toward" his camera equipment and repositioned it as directed. Doc. 62 at 9. Even accepting the Court's characterization of Mr. Reardon's manner of expression, such "boisterous" political criticism receives full First Amendment protection, particularly in traditional public forums where citizens historically exercise their rights to criticize government officials. *See Edwards v. South Carolina*, 372 U.S. 229, 238 (1963) (protecting "boisterous" and "loud" political expression on government property).

Despite this compliance, Deputy Marshal Nugent "gave a three second countdown before arresting Reardon." *Id.* This immediate arrest following Mr.

7

Reardon's compliance with the directive to move the camera demonstrates that the government's concern was not actually about obstruction—which had been remedied through relocation—but about suppressing Mr. Reardon's protected expressive and journalistic activities.

The three-second timeframe between compliance and arrest reveals the pretextual nature of the obstruction theory. If camera placement genuinely posed safety concerns, Mr. Reardon's movement of the equipment should have resolved the government's stated concern. Instead, the immediate arrest following compliance demonstrates that the prosecution targeted Mr. Reardon's protected activities, not any legitimate obstruction concern.

The government's immediate seizure of journalistic equipment following Mr. Reardon's compliance with relocation directives compounds the constitutional violation. The seizure prevented Mr. Reardon from continuing his protected newsgathering activities and documenting the government's response to his petition efforts. This represents a clear violation of established press freedom protections that prohibit government interference with journalistic documentation of official conduct.

### C. The Emergency Exit Obstruction Theory Makes the Regulation Constitutionally Overbroad Facially and As Applied

#### 1. No Actual Obstruction Occurred

The government's emergency exit obstruction theory fails factually. The Court found that Mr. Reardon placed his camera "in front of an emergency exit door that was locked and designated for emergency use only." Doc. 62 at 8, 13. This finding

actually undermines the government's obstruction theory because it reveals no actual interference with the door's operational use.

The regulation prohibits "unreasonably obstructs the usual use of entrances." 41 C.F.R. § 102-74.390(b). The "usual use" of a locked emergency exit is to remain closed during normal operations. An emergency exit's potential activation during a hypothetical emergency constitutes its exceptional use, not its "usual" use within the plain meaning of the regulation. The Court's interpretation that treats emergency availability as "usual use" reads the word "usual" out of the regulation entirely, creating an impermissibly broad application that criminalizes protected expression.

The Court's finding that the government waited twenty minutes before addressing the camera equipment, Doc. 62 at 9, demonstrates that no urgent safety concern existed. If camera placement truly posed an emergency access threat requiring immediate action, the government's lengthy delay contradicts any claim of genuine safety necessity. The government's own conduct proves that any claimed obstruction was theoretical rather than actual, failing to meet even basic regulatory requirements for demonstrating interference with "usual use."

### 2. The Emergency Exit Obstruction Theory Makes the Regulation Constitutionally Overbroad

The Court's expansive interpretation of "usual use" to include emergency availability, security observation, and symbolic functions renders the regulation unconstitutionally overbroad as applied to First Amendment activity. Under the Court's analysis, virtually any First Amendment activity near courthouse entrances

9

could constitute criminal obstruction. A journalist photographing courthouse activities near glass doors "obstructs" security observation. Protesters holding signs in sight lines to emergency exits "obstruct" emergency availability. Citizens gathering[1] in the portico area for political discussion interfere with the "dignified transitional space" the Court identified as part of the entrance's function. Doc. 62 at 13.

This interpretation violates the overbreadth doctrine because it criminalizes a substantial amount of protected expression relative to the statute's plainly legitimate sweep. While Mr. Reardon's constitutional claims have been framed as as-applied challenges throughout this litigation, the Court's interpretation of "usual use" to include emergency availability creates a facial overbreadth problem that must now be addressed. Under First Amendment doctrine, a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citing to *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449, n. 6 (2008)). For example, in *Cox v. State of Louisiana*, 379 U.S. 536 (1965), the Supreme Court reversed a conviction under Louisiana's "obstructing public passages" statute, holding that as applied to peaceful protest on

---

[1] Yearly events such as Mardi Gras parades and Festival International de Louisiane occur at the same location Mr. Reardon was protesting. These events bring thousands of citizens and individuals to the very location where these events occur. Yet, no prosecution under Section 102-74.390(a) has occurred at this location until Mr. Reardon's case.

public property near a courthouse, the statute "sweeps within its broad scope activities that are constitutionally protected free speech and assembly." *Id.* at 552. The federal regulation here suffers from identical constitutional defects when applied to political protest and journalistic activities.

The overbreadth problem is compounded because the regulation provides no meaningful limiting principle for distinguishing protected expression from criminal obstruction. The Court's interpretation creates "a criminal prohibition of alarming breadth," *Stevens*, 559 U.S. at 474, that transforms any presence near courthouse entrances into potential criminal conduct, thereby creating a chilling effect on core First Amendment activities. Citizens cannot reasonably predict what conduct might violate an "obstruction" standard that encompasses theoretical interference with emergency functions, security observation, and symbolic dignity.

### 3. The Regulation Fails Narrow Tailoring Requirements

The government failed to employ less restrictive means to address any legitimate concerns. If camera placement near a locked emergency exit created any safety issue, the government could have directed Mr. Reardon to reposition the equipment to a specific location that addressed safety concerns while preserving his expressive and newsgathering rights. Instead, the government chose the most speech-restrictive response: immediate arrest and equipment seizure. This approach violates the requirement that regulations affecting speech be narrowly tailored to serve legitimate interests while preserving maximum expressive freedom.

11

The regulation cannot constitutionally criminalize conduct that poses only speculative interference with hypothetical emergency scenarios. The First Amendment requires that restrictions on protected expression be justified by actual, not theoretical, government interests. Here, the twenty-minute delay, the locked status of the door, and the absence of any demonstrated emergency access problem reveal that the prosecution criminalized protected petition and journalistic activities based on purely speculative concerns.

### D. The Court's Findings Demonstrate Content-Based Enforcement That Cannot Satisfy Strict Scrutiny

#### 1. The BOLO Alert and Surveillance Pattern Reveal Content-Based Targeting

The Court's factual findings reveal a clear pattern of content-based enforcement that triggers strict scrutiny analysis under *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Government restrictions are content-based if they "target speech based on its communicative content" or if "a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. The Court's findings establish these standards for content-based analysis.

*First*, the enforcement pattern demonstrates targeting based on communicative content. The Court found that Mr. Reardon was placed under surveillance following his initial courthouse visit where he engaged in "stress testing" of constitutional rights to record and criticize U.S. marshal personnel. Doc. 62 at 5-6. Significantly, the Court found that Deputy Marshal Farrish specifically told Mr.

Reardon during his second visit that he could not "loiter in the lobby" or conduct "recording on federal property"–warnings that targeted his journalistic documentation of government conduct rather than general security concerns. Doc. 62 at 6. A BOLO alert was then issued specifically targeting his journalistic activities documenting government conduct. Doc. 62 at 7. This sequence demonstrates that enforcement decisions focused on suppressing Mr. Reardon's criticism of federal officials rather than addressing content-neutral security concerns.

*Second*, the Court's analysis demonstrates that applying the regulation required examination of speech content. The Court emphasized Mr. Reardon's "expletive-laden language," his "boisterous" conduct, and his expression of "extreme discontent" with the U.S. Marshals Service. Doc. 62 at 8-9. These findings show that the government's enforcement decision and the Court's analysis both focused on the specific content of Mr. Reardon's criticism rather than content-neutral considerations like location, time, or manner of expression.

*Third,* the government's selective enforcement further demonstrates content discrimination. The Court found that the government abandoned noise-related charges under subsection (a) while proceeding solely on obstruction charges under subsection (b). Doc. 62 at 10. This prosecutorial choice reveals that the government targeted Mr. Reardon's expressive conduct rather than any actual disruption, focusing on his criticism of federal officials rather than legitimate operational concerns.

13

## 2. The Government Cannot Satisfy Strict Scrutiny

Under strict scrutiny analysis, content-based restrictions must be narrowly tailored to serve compelling government interests and must use the least restrictive means available. *Reed*, 576 U.S. at 171. The government cannot satisfy this demanding standard based on the Court's findings.

The government lacks a compelling interest justifying this content-based enforcement. The twenty-minute delay before addressing camera equipment undermines any claim of urgent security necessity. The government's focus on Mr. Reardon's critical speech content rather than content-neutral safety concerns demonstrates that the enforcement served no compelling security interest. Instead, the prosecution appears designed to suppress criticism of government officials—a purpose the First Amendment categorically prohibits.

The enforcement also fails narrow tailoring requirements. The government could have addressed any legitimate concerns through content-neutral means that preserved Mr. Reardon's expressive rights. Time, place, and manner restrictions could have accommodated both security interests and First Amendment protection. Instead, the government chose to arrest and prosecute based on the content of political criticism, employing the most speech-restrictive means available while Mr. Reardon had never been prohibited from recording in the portico area during prior visits.

Finally, the courthouse portico constitutes a traditional public forum where

14

content-based restrictions receive the most demanding constitutional scrutiny. In *United States v. Grace*, 461 U.S. 171 (1983), the Supreme Court held that courthouse sidewalks and steps are "among those areas of public property that traditionally have been held open to the public for expressive activities" and are thus traditional public forums entitled to the highest First Amendment protection. *Id.* at 179. The Court specifically recognized that such areas "occup[y] a special position in terms of First Amendment protection" because they provide citizens access to government buildings where they conduct business and seek to petition for redress of grievances. *Id.* at 180. The courthouse portico here serves the identical public access function that *Grace* protected, making content-based restrictions presumptively unconstitutional.

The ambiguity of the differing sections of the exterior of the courthouse were demonstrated in this case by the parties and the Court touring these features before trial. Description of these differing exterior areas also required substantial explanation in the Court's written reasons. Doc. 62 at 2-3. If these differing *exterior* features of the courthouse are not intuitive to learned counsel and the Court, Mr. Reardon cannot have been expected to understand that some portions of the exterior of the courthouse were permissible to record and other portions (like the portico) were not. And no government official ever told Mr. Reardon he could not record in the portico or could not place his camera in the portico—until deputy Nugent confronted Reardon and arrested him.

The courthouse portico serves as the primary public pathway for courthouse

15

access and has historically been used for political expression and petition activities. In such traditional public forums, content-based restrictions are presumptively unconstitutional and can survive only under the most demanding strict scrutiny analysis—a standard the government cannot meet here.

## II. CONCLUSION

Even accepting the Court's factual findings, the prosecution and conviction violate clearly established First Amendment precedent. The regulation's application to Mr. Reardon's conduct fails every constitutional test: it restricts protected expression in a traditional public forum, discriminates based on the content of his criticism, lacks narrow tailoring to serve legitimate interests, and criminalizes the exercise of fundamental rights to speech, press, and petition.

For the foregoing reasons, and those set forth in the original Motion to Dismiss and Reply Memorandum, Mr. Reardon respectfully requests that this Court grant his Motion to Dismiss the Bill of Information and dismiss all charges against him.

        RESPECTFULLY SUBMITTED,

        CRISTIE GAUTREAUX GIBBENS
        Interim Federal Public Defender

BY:   *s/ Dustin C. Talbot*
       DUSTIN C. TALBOT
       Appellate Chief
       Federal Public Defender's Office
       Middle and Western Districts of Louisiana
       102 Versailles Boulevard, Suite 816
       Lafayette, Louisiana 70501
       Telephone: (337) 262-6336

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 22, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*
