**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

UNITED STATES OF AMERICA                    CASE NO.  6:25-CR-00227-01

VERSUS

MATTHEW REARDON (01)                    MAGISTRATE JUDGE LEBLANC

## MEMORANDUM ORDER

The United States charged Defendant Matthew Reardon by Bill of Information with one count of violating 41 C.F.R. § 102-74.390 (a)–(b) based on conduct that occurred on August 25, 2025, at the John M. Shaw United States Courthouse in Lafayette, Louisiana.  After a bench trial on the merits, and for reasons stated in its Reasons for Judgment [doc. 62], the Court adjudged Reardon guilty of violating 41 C.F.R. § 102-74.390 (b) for unreasonably obstructing the usual use of the courthouse entrance.

Via Motion to Dismiss [doc. 16] filed before trial, Reardon seeks dismissal of the Bill of Information under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure on the grounds that the charged conduct constitutes protected expression under the First Amendment to the United States Constitution.  Doc. 16.  Reardon argues this prosecution impermissibly punishes his exercise of fundamental rights of free speech, press, and petition for redress of grievances, and that 41 C.F.R. § 102-74.390 is unconstitutional on its face and as applied to his conduct.[1]  Oral argument

---

[1] Reardon filed the Motion to Dismiss before trial.  Doc. 16. The motion asserts that "41 C.F.R. § 102-74.390 is facially overbroad and unconstitutional as applied to his peaceful journalistic and protest activities conducted in a traditional public forum."  Doc. 16, p. 1.  Defendant's pre-trial reply in further support of the motion clarifies, however, that "Mr. Reardon has not mounted a facial challenge to the regulation. His arguments concern how the regulation was applied to his specific conduct in this case: peaceful political protest and journalistic documentation on courthouse steps." Doc. 21. Because it raised only an as-applied challenge to the statute, the court deferred ruling on the motion to dismiss until after receiving evidence at trial. Doc. 54.  In a supplemental brief filed after this Court issued its Reasons for

1

was heard on February 6, 2026.  Doc. 66.  For the reasons that follow, the motion to dismiss [doc. 16] is **DENIED**.

**I.**

**BACKGROUND**

Reardon was arrested on August 25, 2025, at the John M. Shaw United States courthouse in Lafayette, Louisiana (the "Courthouse"), for violating 41 C.F.R. § 102–74.390(b).[2]  It reads:

> **What is the policy concerning disturbances?**
>
> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct, or exhibiting other conduct on property that—
> [ . . . ]
> (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;
> [ . . .]

41 C.F.R. § 102–74.390 (the "Disturbance Provision") (omissions added).[3]  Reardon was found to have obstructed the Courthouse entrances.

**A.      Courthouse Description**

Because his motion to dismiss relies in part on the argument that Reardon was arrested in a public forum, where the government has limited ability to restrict expressive activity, a description of the Courthouse is necessary.  *See generally* Gov't Ex. 14 (photograph of the front

---

Judgment following trial, Reardon argued for the first time that the court's interpretation of the Disturbance Provision makes the statute facially overbroad.  Doc. 63, p. 8.

[2] The Reasons for Judgment [doc. 62] provide a more detailed version of the relevant facts, which are condensed here for the purposes of this motion.

[3] The Disturbance Provision appears in the Rules and Regulations Governing Conduct on Federal Property, (the "GSA Conduct Rules") promulgated by the Secretary of Homeland Security in consultation with the Administrator of General Services, in effect at the time of the arrest.  The GSA Conduct Rules were adopted pursuant to 40 U.S.C. § 1315(c), which confers authority on the Secretary of Homeland Security to prescribe regulations with penalties limited to a fine and/or thirty days imprisonment corresponding to a class C misdemeanor, per 18 U.S.C. § 3559(a)(8).  The GSA is the "U.S. General Services Administration, acting by or through the Administrator of General Services."  41 C.F.R. § 102-71.10.  In its findings of fact, the Court concluded that the GSA Conduct Rules were conspicuously posted at the Courthouse, that Reardon had full knowledge of its existence and placement, and that he was fully on notice as to the existence and import of the GSA Conduct Rules.

of the Courthouse).  The Courthouse faces Lafayette Street.  Beginning at the street and moving toward the Courthouse, a public sidewalk runs adjacent to Lafayette Street and extends from the curb of the street to a set of concrete bollards.  A paved concrete area the width of the Courthouse extends from the concrete bollards to the foot of the steps that lead to the entrance area of the Courthouse.  At the foot of the steps are metal barricades that prevent access to the Courthouse steps.  At the top of the steps, there is an uncovered landing area.  The uncovered landing area is bounded on each side by raised platforms with statues on them.  The landing eventually reaches a colonnade supporting the overhang of the second story of the Courthouse and transitions into a covered area between the colonnade and the exterior entrance doors.  This covered area is referred to as the porch or portico.  Instead of using the steps to access the Courthouse, which are blocked by the metal barricades, visitors use ramps on either side of the portico.  Beyond the exterior entrance into the building is a foyer that leads to the interior entrance doors.  Once through the interior entrance doors, visitors are in the unsecured lobby of the Courthouse with a set of turnstiles directly in front and a security screening station to the left.  The turnstiles are for exiting only. Beyond the turnstiles is the secured lobby or atrium, which includes the elevators and stairs to access other floors of the Courthouse as well as access points to other offices that are located on the first floor.  To gain access to the balance of the Courthouse, visitors must proceed through the security screening station, which routes persons around the turnstiles and into the atrium.  The unsecured lobby and the atrium are one large space, physically divided only by the turnstiles.

With respect to the entrances, the exterior entrance is comprised of five sets of glass double doors and two sets of windows.  Facing the front of the Courthouse, and from left to right the exterior entrance is configured as follows:  a set of doors that cannot be accessed from the outside but are operated by a push bar from the inside for exiting; a set of windows; a set of doors that are

3

designated as an emergency exit ("EE-1 Door"); a set of doors that are designated as an emergency exit ("EE-2 Door"); a set of doors designated as the main entrance and exit doors (the "Entrance/Exit Door"); a set of windows; and a set of doors that cannot be accessed from the outside by the public but are operated by a push bar from the inside for exiting. The EE-2 Door is in the center of the exterior entrance area. The two emergency exits remain locked, but court security personnel are readily available to unlock them should the need arise. All of these doors open outwardly into the portico. The interior entrance is again a bank of glass doors and windows, with the center doors remaining open to permit access into the lobby.

**B.      Events leading to Reardon's arrest**

Beginning on June 23, 2025, Reardon paid three visits to the Courthouse. The purpose of his first visit was to determine whether his constitutional rights would be violated by interactions with personnel there. He proceeded to film inside the unsecured portion of the Courthouse lobby and was advised by Court Security Officers and Deputy Marshals of the United States Marshals Service ("U.S.M.S.") that he could not do so, finally exiting the Courthouse after insisting at length that the "Rules and Regulations Governing Conduct on Federal Property," (the "GSA Conduct Rules") permitted him to do so. The purpose of the second visit on June 26, 2025, was to file a complaint about his interactions with one of the Deputy Marshals on his first visit. The purpose of the third visit on August 25, 2025, was to publicly protest and express his "extreme discontent" with the U.S.M.S. after Reardon learned that the U.S.M.S. had issued a be-on-the-lookout notice, or "BOLO," about him to other law enforcement after the earlier visits. Because he works as an internet content creator and independent journalist, Reardon made video recordings of each visit to the Courthouse.

4

Reardon started his August 25, 2025, protest in front of the Courthouse, on the sidewalk near the street.  He arranged a camera on a tripod and two smartphones to capture his protest efforts, and he displayed multiple posters, handwritten on foam posterboard, criticizing the U.S.M.S. and employing expletives to do so.  After protesting near the street for a period, Reardon observed one of the Deputy Marshals make a gesture from inside the Courthouse that Reardon interpreted as an invitation to enter the Courthouse.  He gathered his belongings and made his way to one of the ramps leading to the portico.  Upon arriving on the portico, Reardon set his tripod and camera between two of the columns of the colonnade facing the EE-1 Door. He attempted to enter the Courthouse through the EE-2 Door then the EE-1 Door, finding both to be locked.  He then made his way to the Entrance/Exit Door with posters under his arm and a video-recording device operating.

As Reardon came through the Entrance/Exit Door and was approaching the open center door of the interior entrance, he was met by Deputy United States Marshal Hayden Nugent, who had been present for Reardon's two previous visits.  Deputy Nugent informed Reardon that he had not been invited inside the Courthouse and that he would be arrested if he attempted to film inside the Courthouse.  Reardon, believing he had been duped into entering the Courthouse, began loudly protesting Deputy Marshal Nugent in expletive-laden language as he exited the building.  Instead of returning to the sidewalk, however, Reardon resumed his protest under the portico, noting to his online audience, "now they just asked for it" and "there's a big part of me that wants to go back in and take the arrest."  He continued:  "They want it.  They want it."

After exiting the Courthouse, Reardon began to "hang some signs," lamenting that he should have brought tape.  Several times, he displayed a 20- by 30-inch posterboard to those inside by holding the posterboard against or directly in front of the EE-1 Door, the EE-2 Door and the

5

Entrance/Exit Door, obstructing the view through those doors when he did so.  While holding a posterboard up to one of the emergency exit doors, he greeted a visitor to the courthouse by calling out "Happy F*** the U.S. Marshals Day!" (using the expletive).  Shortly thereafter, he stationed himself with the posterboard in front of the Entrance/Exit Door for approximately 20 seconds, at one point propping the poster on the pair of door handles for that set of doors, blocking its use entirely.

Reardon then moved the tripod and camera from where he had left it between columns and positioned it directly in front of the EE-2 Door with at least one of the feet of the tripod touching the door and the mounted camera "recording right against the glass."  He then made his way down the portico to the right of the EE-2 Door, past two more sets of doors and a set of windows, eventually taking his place on the statue platform at that end of the landing area.  At this point, he was quite a distance away from the tripod and camera, and his protest and videoing activities directed his attention away from the area of the EE-2 Door where that equipment was left.

Reardon had been conducting his protest activities from the statue platform for about 20 minutes when Deputy Marshal Nugent and another Deputy United States Marshal exited the building and approached him.  Deputy Marshal Nugent directed Reardon to remove the camera blocking the emergency exit door, advising it presented a hazard and warning that it would be seized otherwise.  Reardon refused to move the camera, telling Deputy Marshal Nugent "you need to suck my d**k!"  In response, Deputy Marshal Nugent advised Reardon he was seizing the camera and tripod and then turned and started to walk toward the equipment.  At this point, being a good distance away from the equipment, Reardon quickly moved toward it, yelling a warning at Deputy Marshal Nugent not to touch it.  Upon both arriving at the tripod and camera, Deputy Marshal Nugent directed Reardon to move the camera to the far side of the metal barricades on

6

the sidewalk below, and Reardon protested that "I'm fine right here."  Deputy Marshal Nugent

stated that he would be arrested if he did not comply and gave a three second countdown before

arresting Reardon and taking him into custody when he refused to do as instructed.

After trial, Reardon was found guilty of violating the portion of the Disturbances Provision

that prohibits "loitering, exhibiting disorderly conduct, or exhibiting other conduct on property

that . . . Unreasonably obstructs the usual use of entrances. . ." 41 C.F.R. § 102–74.390.  The court

found that

> Reardon's actions obstructed the usual use of the Courthouse entrance in three
> ways. He obstructed the use of these doors as doors by placing himself and his
> camera equipment in front of the doors for a prolonged period with no apparent
> purpose other than to provoke a response from security personnel. He also
> obstructed the use of the doors as a means for security personnel to observe the
> building's exterior through the glass by partially covering the glass doors with
> posterboard. And he interfered with and disrupted the usual use of the Courthouse's
> entrance as a dignified transitional space that befits the importance of business
> conducted within.

Doc. 62, p. 14.

In making this ruling, the court referenced testimony that the unobstructed doors and

windows of the Courthouse entrance have safety and security functions, allowing security officers

to observe and assess visitors and other activity outside the Courthouse, as well as allowing rapid

evacuation of the Courthouse through emergency exit doors.  The court also made note of

jurisprudence describing the symbolic functions of courthouse architecture and entrances.  The

court therefore interpreted the phrase "obstructs the usual use of entrances" in the Disturbance

Provision to encompass conduct that not only obstructs the use of doors as doors, but that also

"impedes, impairs, and obstructs the use of the Courthouse entrance . . . as an entrance system that

has security, safety, and symbolic functions, as well as the purely practical function of allowing

visitors to come and go."  Doc. 62, p. 13.

C.       **Reardon's Arguments**

The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  Reardon argues that at the time of his arrest he was engaged in activity protected under the First Amendment: expressive speech, journalistic activity, and petitioning the government for redress of grievances.   Thus, the question raised by this motion is whether the Disturbance Provision or its enforcement impermissibly burdened Reardon's First Amendment rights.

Reardon's Motion to Dismiss challenges the Bill of Information on three bases.  First, he raises a facial challenge to the statue based on the court's interpretation of the phrase "obstructs the usual use of entrances," arguing that if the statute can be interpreted to encompass such a wide range of activity that it includes placing a camera in front of a locked emergency exit door, the statue is overbroad.  This argument suggests the Disturbance Provision is both vague, in that it does not place visitors on notice as to what conduct is prohibited, and overbroad, in that it sweeps too broadly as the court interprets it, such that "virtually any First Amendment activity near courthouse entrances could constitute criminal obstruction."  Doc. 64, pp. 9-10.

Second, Reardon argues the Disturbance Provision is unconstitutional as applied to his activities, which he describes as core First Amendment activity.  In other words, even if the Disturbance Provision is constitutional in some applications, Reardon argues it is unconstitutional as applied to his First Amendment activities, which he describes as a quintessential journalistic activity in a public forum.

8

Third, Reardon argues the manner of his arrest indicates selective, content-based enforcement of the Disturbance Provision.  That is, he argues that because his message was critical of the U.S.M.S., he was arrested for conduct that would have otherwise been ignored or tolerated because the camera created no actual obstruction to an operational entrance.

Reardon's arguments rely heavily on the assumption that the conduct for which he was arrested took place in a traditional public forum.  Doc. 16, att. 1, p. 7, 15–17.  The analysis begins, therefore, by determining whether the portico/entrance area is a public forum and then proceeds to address Reardon's arguments.

## II.
### ANALYSIS

There is no doubt that as a general matter, the First Amendment protects those who protest the government, seek to file complaints against the government, and document governmental activity.  Nonetheless, "[e]ven protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985).  As discussed below, the government may reasonably regulate protected speech in non-public forums, and the court finds that the area just outside the Courthouse entrance where Reardon was arrested is a non-public forum.

**A.    Reardon was arrested in a nonpublic forum—the immediate vicinity of the courthouse entrance, where reasonable regulation of speech activity is permitted.**

**1.  The distinction between public and nonpublic forums**

The first step in assessing whether a restriction on speech infringes constitutional rights is to identify the type of forum on which the alleged violation occurred, because the "determination of the character of the forum in which expression was regulated shapes our determination whether ... a constitutional violation occurred." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757 (5th Cir. 2010) (omission original) (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001)).  "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).  "There are three categories of forums . . . : (1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums." *Fairchild*, 597 F.3d at 757–58 (citing *Frisby v. Schultz*, 487 U.S. 474, 483 (1988)).  The discussion here focuses only upon public versus nonpublic forums because neither party has suggested this case involves a limited public forum.

Any regulation of protected speech in a public forum will be strictly scrutinized because such places are historically associated with free expression. "Public places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered "public forums." *U.S. v. Grace*, 461 U.S. 171, 177 (1983).  "The objective characteristics of these properties require the government to accommodate private speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).  "Some public property, as a matter of tradition, is deemed dedicated to the exercise of expressive activity by the public. The 'quintessential' examples of such traditional public forums are streets, sidewalks, and parks, all of which, 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens,

10

and discussing public questions.'" *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015) (quoting *Perry Educ. Ass'n,* 460 U.S. at 45).  A public forum can also arise by specific designation (rather than tradition) when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.*  Nonetheless, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.  Government regulation of speech in public forums must withstand strict scrutiny and be narrowly tailored to a compelling government interest.   *Chiu*, 260 F.3d at 344–45.

"Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all." *Forbes*, 523 U.S. at 678.  A non-public forum is often described in the negative, as one that has not been opened for expressive activity.  "Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Perry Educ. Ass'n*, 460 U.S. at 46 (citing *U. S. Postal Serv. v. Council of Greenburgh Civic Ass'n,* 453 U.S. 114, 129 (1981)).   The Supreme Court has emphasized, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n*, 460 U.S at 46.  The government, thus, has greater ability to regulate speech in those forums.

The Government's ability to limit speech in a "nonpublic forum" is limited to "reasonable" restrictions on speech that cannot suppress particular viewpoints. *Hodge*, 799 F.3d at 1162.  In an "an area not traditionally kept open for expressive activity by the public[,] [t]he government retains substantially greater leeway to limit expressive conduct in such an area and to preserve the property

for its intended purposes. . ." *Id.* at 1150.  "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806.

### 2.  The Courthouse portico is a nonpublic forum.

A courthouse and its grounds are generally recognized to be a nonpublic forum, even if the streets and sidewalks adjoining the courthouse grounds are likely to be considered a traditional public forum. *Hodge*, 799 F.3d at 1159.  Because the judiciary does not decide cases by reference to popular opinion, courthouse grounds are not considered a public forum, even if analogous legislative grounds are. *Id.* (citing *Lederman v. United States*, 291 F.3d 36, 41–42 (D.C. Cir. 2002); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C. 1972), *aff'd,* 409 U.S. 972 (1972)).  "Many federal courts and most circuits have held that a courthouse is a nonpublic forum." *Confessore v. Hood*, No. 1:22-CV-302, 2023 WL 1978915, at *3 (E.D. Tex. Jan. 17, 2023), *report and recommendation adopted*, 2023 WL 1971280 (E.D. Tex. Feb. 10, 2023) (collecting cases).  Courts have recognized that the purpose of a courthouse, "to facilitate the smooth operation of a government's judicial functions," may be incompatible with "various kinds of expressive activities" that could interfere with the court's functions.  *Huminski v. Corsones*, 396 F.3d 53, 90 (2d Cir. 2005) (noting that the building housing a district court is a nonpublic forum and that the petitioner had not shown that the adjacent parking lot was a public forum).

In classifying the area in the immediate vicinity of the Courthouse entrance as public or nonpublic, two cases about protests near the United States Supreme Court building are instructive. In *United States v. Grace*, the United States Supreme Court held that the sidewalks adjacent to the Supreme Court grounds are a public forum, such that a statute prohibiting the display of political messaging was unconstitutional as applied to the sidewalks.  *Grace*, 461 U.S. at 183.  The Court

reasoned in relevant part, "There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180. The court concluded that the Supreme Court sidewalks, as a public forum, could be subjected to no greater speech regulations than any other sidewalks because they were identical to any other sidewalk: "Those sidewalks are used by the public like other public sidewalks. There is nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds or are in any way different from other public sidewalks in the city." *Id.* at 183. By contrast, in *Hodge v. Talkin*, the United States Court of Appeals, District of Columbia Circuit, held that the Supreme Court plaza is a nonpublic forum, noting that "[t]he Court's analysis in *Grace* directly points the way to that conclusion." *Hodge*, 799 F.3d at 1158. Whereas in *Grace*, the sidewalk's lack of distinctiveness led the Court to conclude that it must be treated as a public forum like other public sidewalk, in *Hodge*, multiple markers set the plaza aside as part of the Supreme Court building:

> The plaza's appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks and surrounding area. The plaza is elevated from the sidewalk by a set of marble steps. A low, patterned marble wall—the same type of wall that encircles the rest of the building—surrounds the plaza platform and defines its boundaries. And the plaza and the steps rising to it are composed of white marble that contrasts sharply with the concrete sidewalk in front of it, but that matches the staircase ascending to the Court's front doors and the façade of the building itself.

*Hodge*, 799 F.3d at 1158.

*Grace* and *Hodge* instruct that somewhere between the sidewalk and the Courthouse door, the public forum ends and the nonpublic forum begins. For the purposes of this case, the colonnade separating the portico from the landing and steps provides a clear marker that a visitor is in the

13

"special enclave" of the Courthouse and no longer in a public forum.[4]  The portico is distinct from the sidewalks in *Grace* because it clearly indicates to the public "by its materials, design, and demarcation from the surrounding area" that it is part of the courthouse grounds.  *Hodge*, 799 F.3d at 1150; *see also United States v. Gilbert*, 920 F.2d 878, 881–885 (11th Cir. 1991) (holding that portico area between the building's columns and the entrance was a nonpublic forum even though the adjacent unenclosed plaza was a public forum based on its regular use for demonstrations).  Additionally, there is no evidence that the portico has been opened to regular use as a public forum.[5]  Thus, although the sidewalk area where Reardon began his protest is a traditional public forum, *see Grace*, 461 U.S. at 183, the conduct for which Reardon was arrested occurred in a nonpublic forum, the area just in front of the main doors to the Courthouse under the covered portico.  *See Hodge*, 799 F.3d at 1158; *Gilbert*, 920 F.2d at 885.

Reardon's challenge to his arrest and prosecution, therefore, will be evaluated under principles governing speech in nonpublic forums, and, in particular, the requirement that restrictions on speech must be reasonable in light of the purpose of the forum and viewpoint neutral.

---

[4] This is not to say that the colonnade is the only signifier of the public/nonpublic transition.  It could be determined—though it is not necessary to determine here—that the steps themselves, the landing, and the statutes with their platforms are all in the nonpublic realm of the Courthouse itself.

[5] Although one of the U.S. Marshals testified that he would not be surprised to hear that journalists with cameras sometimes wait in the portico area to conduct interviews of attorneys leaving the courthouse and that the public sometimes enters the portico area during parades and festivals, there was no testimony that the portico area has been opened as a forum for expressive activity.  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.  "Indeed, if the law were otherwise, the government would be required to stand guard over its property ready to chase away anyone who sought to use the property for expressive conduct, for fear of creating a public forum by acquiescence." *Gilbert*, 920 F.2d at 885.

14

**B.**     **Both facially and as applied to Reardon's activities, the Disturbance Provision is a reasonable restriction of speech in light of the purposes served by the forum.**

As discussed above, the court finds the portico area of the Courthouse to be a nonpublic forum.  That being the case, the government may place reasonable restrictions on speech occurring in the portico area.  The court also finds the Disturbance Provision places reasonable burden on First Amendment activities when viewed in the context of safety, security and symbolic functions of the Courthouse entrance, which are discussed above and in more detail in the Memorandum Ruling.

**1.  Reardon's facial challenge fails.**

Reardon's motion asks the court to find the Disturbance Provision facially invalid as both vague and overbroad. This argument was not extensively briefed and only raised for the first time after the court issued its written Reasons for Judgment.[6]   The vagueness and overbreadth arguments require separate analyses.

**a.  The Disturbance Provision is not overbroad on its face.**

Reardon argues the Disturbance Provision is overbroad on its face.  The first step in an overbreadth analysis is to construe the statute.  *United States v. Stevens*, 559 U.S. 460, 474 (2010). The relevant text of the Disturbance Provision prohibits "persons entering in or on Federal property" from "conduct" that "[u]nreasonably obstructs the usual use of entrances."  41 C.F.R. § 102–74.390 (b).  As interpreted in the Memorandum Ruling, the phrase "obstructs the usual use of entrances" encompasses conduct that not only obstructs the use of doors as doors, but that also "impedes, impairs, and obstructs the use of the Courthouse entrance . . . as an entrance system that has security, safety, and symbolic functions, as well as the purely practical function of allowing

---

[6] See footnote 1, *supra.*

visitors to come and go." Doc. 62, p. 13. Thus, the relevant text of the Disturbance Provision is construed to prohibit conduct on federal property that unreasonably obstructs the usual use of entrances, where "entrances" may be understood to have a broader meaning than "door," but is still limited to the place where one passes from exterior space to interior space with fixed functions that have been established in the record.

The Supreme Court has cautioned that a facial challenge can succeed only if "'no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "In the First Amendment context, however, this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473. To succeed on a facial overbreadth challenge in this case, there must be a showing of "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt." *Shackelford v. Shirley*, 948 F.2d 935, 940 (5th Cir. 1991) (quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984))(alteration original). For example, in *United States v. Stevens*, the Supreme Court considered evidence that numerous categories of otherwise protected speech—including depictions relating to hunting, fishing, and agriculture—could be rendered illegal by a statute meant to criminalize depictions of animal cruelty. 559 U.S. at 475. Nevertheless, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles*, 466 U.S. at 800.

16

Reardon argues, in essence, that the Disturbance Provision must be invalid as interpreted because of it places a burden on First Amendment activities such as his.  Doc. 64, pp. 9–10.  The problem with Reardon's argument is that First Amendment activities are subject to reasonable regulation in the immediate vicinity of the Courthouse entrance because it is a nonpublic forum.  Expressive activity is *always* subject to reasonable, viewpoint neutral regulation in a nonpublic forum.  *Cornelius*, 473 U.S. at 800.  It is not enough to identify First Amendment activity that the statute could potentially prohibit; Reardon must identify *unconstitutional* applications of the statute.[7]  *See Stevens*, 559 U.S. at 473 (identifying categories of otherwise protected speech that could be criminalized by overly broad statute aimed at depictions of animal cruelty).  Reardon has not done so.

### b.  The Disturbance Provision is not unconstitutionally vague on its face.

Reardon also argues that the Disturbance Provision is unconstitutionally vague on its face.  A criminal statute may be impermissibly vague if it fails to define the conduct that constitutes a violation.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  "'A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it

---

[7] Addressing Reardon's concern that the court's interpretation of "usual use" and "entrance" sweeps too broadly, it should be noted that this interpretation does not necessarily apply to the entrance of every federal property.  It applies only to entrances such as the Courthouse entrance with established security, safety, and symbolic functions.  That is, the "usual use" of a courthouse entrance will be different from the "usual use" of entrances at post offices, national park facilities, or federal agency buildings.  The statue prohibits unreasonable obstruction of the usual use of all such entrances, but it does not follow that what constitutes a violation at one entrance will constitute a violation at all entrances.  The court's interpretation of the statue to prohibit Reardon's activities in this context is applicable only to analogous contexts.

allows arbitrary and discriminatory enforcement.'" *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (quoting *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224 (5th Cir. 2009)). "This circuit's precedent instructs that a facial challenge may only be sustained 'if the enactment is impermissibly vague in all of its applications.'" *McClelland*, 63 F.4th at 1013.

The Disturbance Provision is not facially vague. An ordinary person would likely read "unreasonably obstruct" and "usual use" as a signal that the statute does not prohibit reasonable, temporary obstructions of the entrance incident to the normal business of the building. For example, one might reasonably obstruct courthouse entrances by standing in a line of potential jurors waiting to pass through security, temporarily setting down a box of exhibits near a door while conducting a conversation, waiting near an entrance for the arrival of a client or attorney, or even temporarily setting camera equipment near an entrance while waiting for litigants to emerge to be interviewed. The required unreasonableness and unusualness of the obstruction are the key factors that direct and limit enforcement and place visitors on notice as to the scope of prohibited behavior. By anchoring the criminal prohibition to the "unreasonable obstruction" of the "usual use" of the space, 41 C.F.R. § 102–74.390 (b), the statute retains "'flexibility and reasonable breadth'" while making it "clear what the ordinance as a whole prohibits." *Grayned*, 408 U.S. at 110 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted."); *but see United States v. Estrada-Iglesias*, 425 F. Supp. 3d 1265, 1274 (D. Nev. 2019) (holding the term "disorderly conduct" in the Disturbance Provision vague as applied to defendant's conduct, in part because the statue left that term undefined).

18

## 2. Reardon's as-applied challenge fails.

Reardon also argues the Disturbance Provision is unconstitutional as applied to his First Amendment activities.  Considering, as the court must, "the purpose of the forum and all the surrounding circumstances," the enforcement action here was reasonable as applied to Reardon. *Cornelius*, 473 U.S. at 809.  As noted in the Reasons for Judgment, there is a governmental interest in maintaining the order and decorum of the Courthouse entrance specific to courthouses, apart from the government's general interest in maintaining disturbance-free zones in and around federal buildings.  In the Reasons for Judgment, this Court took "judicial notice that the entrances to courthouses are generally designed to signal to visitors that they are entering a special, serious, and frequently silent place, devoted to the administration of justice," and the court quoted from Justice Breyer's *Statement Concerning the Supreme Court's Front Entrance*, as quoted in *Hodge v. Talkin*, 799 F.3d at 1150) (describing the U.S. Supreme Court Plaza as "the opening stage of 'a carefully choreographed, climbing path that ultimately ends at the courtroom itself.'").  An enforcement action aimed at keeping the portico area free of unusual obstruction is "reasonable and rings of the 'common-sense' that is sufficient to uphold a policy under reasonableness review." *Gilbert*, 920 F.2d at 886.

The Disturbance Provision is viewpoint neutral on its face and reasonably related to the government's interest in keeping the immediate vicinity of federal buildings free of obstruction. *See Gilbert*, 920 F.2d at 886 ("the government has a legitimate interest in maintaining the aesthetics of the Russell Building and in keeping the walkways near the building unobstructed").  Even applied to Reardon's exercise of First Amendment activities, the statute's enforcement is reasonable in light of this common-sense purpose and in light of the fact that a public forum for expression is available on the nearby sidewalk, steps away from the Courthouse entrance. *Hodge*,

19

799 F.3d at 1169 ("it is a mark in favor of the statute's reasonableness that the barred activity can be undertaken in an adjacent forum—the sidewalk).

**C.     There has been no showing that Reardon was targeted for the content of his speech.**

Reardon contends the enforcement action demonstrates impermissible targeting based on his criticism of federal law enforcement.  Doc. 16, att. 1, p. 7, doc. 64, pp. 12–13.  Reardon argues such content-based enforcement triggers strict scrutiny under *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015).  Doc. 64, p. 12.  He also argues that selective enforcement of a content-neutral law may violate the First Amendment and that the Disturbance Provision has been selectively enforced here.  Doc. 16, att. 1, p. 23.

Reardon presents the court with a wholly hypothetical and conclusory argument that points to several circumstances suggestive of a pretextual arrest and enforcement.  He asserts—rather than demonstrates with evidence—that no one else has been similarly arrested at the Courthouse for violating the Disturbance Provision.  He describes the placement of his camera and signage as not meaningfully disruptive, and he posits that a protester with a different message would have been tolerated.

"Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created,  . . . the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."  *Cornelius*, 473 U.S. at 806 (internal citations omitted).  A lack of viewpoint neutrality can arise from the way a statute is construed, even if the statute is neutral on its face.  An interpretation of an ordinance that allows people to be "punished for merely expressing unpopular views" would be unconstitutional.  *Grayned*, 408 U.S. at 113

20

(citing *Cox v. Louisiana*, 379 U.S. 536 (1965)).  But the hypothetical possibility of viewpoint-specific enforcement does not invalidate a statute or an enforcement action.  "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

A review of the evidence in this matter does not reveal such a pattern of favoritism.  If there is a case in which a court struck an analogous enforcement or prosecution as pretextual and content-motivated, Reardon does not highlight it for this court.  Nor was there evidence that Courthouse security has tolerated analogous behavior—displaying signage near the courthouse doors and leaving a camera unattended with its tripod legs touching an exit.  Nor was there a showing that the Courthouse portico is regularly or even occasionally used for protest activities of any sort, regardless of message.[8]   We therefore find no basis that Reardon was targeted for arrest because of the content of his speech.

**III.**
**CONCLUSION**

For the reasons stated, the motion to dismiss [doc. 16] is **DENIED**.

**SO ORDERED** at Lake Charles, Louisiana, this 16th day of July, 2026.

_____
**THOMAS P. LEBLANC**
**UNITED STATES MAGISTRATE JUDGE**

---

[8] While a U.S.M.S. official testified he would not be surprised to learn that reporters with cameras may stand just outside the courthouse doors to interview exiting attorneys and litigants, this sort of temporary hindrance would be, as discussed in section II(B)(1)(b) above, the sort of usual obstruction of the entrances incidental to the normal use of the Courthouse.