UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

UNITED STATES OF AMERICA

VERSUS CASE NO: 6:25-CR-00227

MATTHEW REARDON

---

# DEFENDANT'S OPENING APPEAL BRIEF ON APPEAL TO THE DISTRICT COURT

---

[Page intentionally left blank]

## -TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. The courthouse entrance has five sets of glass doors, and only one is unlocked for the public ..... 3

B. Mr. Reardon's two June visits concerned whether he could record in the unsecured lobby ..... 4

C. On August 25, Mr. Reardon livestreamed his protest from the sidewalk until a deputy's gesture drew him to the portico ..... 5

D. The magistrate judge convicted under a reading of the regulation that first appeared in the Reasons for Judgment ..... 9

III. ARGUMENT ..... 10

A. The conviction rests on a construction of "usual use of entrances" that the regulation's text does not bear, and the evidence fails under the construction it does ..... 10

1. Standard of review ..... 10

2. "Usual use of entrances" means passage, and the provision reaches only physical interference with it ..... 11

a. The text and its neighbors limit the provision to interference with how entrances are actually used ..... 11

b. The rule of lenity and the fair-warning principle confirm the narrow reading ..... 13

3. Under the correct construction, the evidence did not prove an unreasonable obstruction of the usual use of any entrance ..... 15

a. The tripod stood against a locked door that had no usual use to obstruct ..... 15

b. Holding a poster to the working door for about twenty seconds, with no one shown trying to pass, did not unreasonably obstruct its usual use ..... 16

c. The "doors as doors" finding does not survive the correct construction ..... 17

d. The proper remedy is a judgment of acquittal ..... 18

B. The portico is a public forum, and even if it is not, the regulation as construed and applied to Mr. Reardon is neither reasonable nor viewpoint neutral ..... 19

1. Standard of review ..... 19

**2.** A nonpublic-forum restriction must rest on objective, workable standards and a reason unrelated to the speaker's viewpoint ........ 19

**3.** As enforced against Mr. Reardon, the regulation satisfies neither requirement ........ 21

**a.** The marshals decided for themselves when Mr. Reardon's display crossed an undefined line ........ 21

**b.** The construction lets the offense turn on the officers' reaction to the message ........ 22

**C.** As construed, the regulation is unconstitutionally vague and overbroad on its face ........ 24

**IV. CONCLUSION** ........ **26**

**CERTIFICATE OF SERVICE** ........ **26**

# TABLE OF AUTHORITIES

CASES

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) .................................. 20

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) ........................ 20

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ........................................................ 14

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................ 25

*Burks v. United States*, 437 U.S. 1 (1978) .................................................................. 18

*Cameron v. Johnson*, 390 U.S. 611 (1968) ................................................................. 12

*City of Houston v. Hill*, 482 U.S. 451 (1987) ..................................................... 20-21, 25

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ..... 20-21, 23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................ 11-12

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) ............................................ 19, 21-22

*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005) ...................................................... 23

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................................. 10

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................................... 25

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ......................................... 19

*Lewis v. City of New Orleans*, 415 U.S. 130 (1974) .................................................... 20

*McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996 (5th Cir. 2023) .......................... 25

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) .................................................. 20, 22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) .................... 20

*Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965) ......................................... 22

*Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017) .......................................................... 22

*United States v. Bader*, 698 F.2d 553 (1st Cir. 1983) .......................................... 12, 16

*United States v. Gilbert*, 47 F.3d 1116 (11th Cir. 1995) ................................ 12-13, 16

*United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991) .......... 19

*United States v. Grace*, 461 U.S. 171 (1983) .......... 19

*United States v. Hollingsworth*, 783 F.3d 556 (5th Cir. 2015) .......... 10, 19, 24

*United States v. Kaluza*, 780 F.3d 647 (5th Cir. 2015) .......... 14

*United States v. Kozminski*, 487 U.S. 931 (1988) .......... 13

*United States v. Sachs*, 679 F.2d 1015 (1st Cir. 1982) .......... 12-13, 16

*United States v. Smith*, 895 F.3d 410 (5th Cir. 2018) .......... 10

*United States v. Strakoff*, 719 F.2d 1307 (5th Cir. 1983) .......... 14

*United States v. Tovar*, 719 F.3d 376 (5th Cir. 2013) .......... 10, 19

*United States v. Williams*, 504 U.S. 36 (1992) .......... 24

*United States v. Williams*, 553 U.S. 285 (2008) .......... 24-25

CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I .......... 2, 19, 23

REGULATIONS

41 C.F.R. § 102-74.390 (2025) .......... 9

41 C.F.R. § 102-74.390(b) (2025) .......... *passim*

41 C.F.R. § 102-74.420(c) (2025) .......... 4, 25

RULES

FED. R. CRIM. P. 58(g)(2) .......... 10

FED. R. CRIM. P. 58(g)(2)(D) .......... 10

FED. R. EVID. 201(e) .......... 14

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

UNITED STATES OF AMERICA

VERSUS CASE NO: 6:25-CR-00227

MATTHEW REARDON

---

**DEFENDANT'S OPENING APPEAL BRIEF ON APPEAL TO THE DISTRICT COURT**

---

## I. Introduction

Matthew Reardon is an independent journalist and First Amendment auditor who travels the country recording in public buildings and tests whether public employees honor constitutional rights. On August 25, 2025, he spent an afternoon protesting the United States Marshals Service outside the federal courthouse in Lafayette, and he livestreamed the whole thing. For nearly half an hour he protested by the street, on and near the public sidewalk, where, by a deputy marshal's own account, no one would have bothered him. He walked up to the building only after a deputy made a gesture from inside that Mr. Reardon took as an invitation to come in. Told he could not film inside, he went back out onto the portico, held his posters to the glass doors, and set his camera on a tripod in front of a locked emergency exit. Twenty minutes after he set the camera down, he was under arrest.

He was convicted of violating 41 C.F.R. § 102-74.390(b) (2025), a General Services Administration (GSA) regulation that prohibits conduct on federal property that "[u]nreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots." The magistrate judge found the protest provocative, but the question on appeal is whether subsection (b) reaches a camera resting against a locked emergency exit that no one used that day and a poster held against the one working door for about twenty seconds with no evidence that anyone was trying to get through.

The magistrate judge answered yes only by reading "usual use of entrances" to protect the "security, safety, and symbolic functions" of a courthouse entrance, a construction that first appeared in the Reasons for Judgment after the evidence had closed. That reading departs from the regulation's text, from the reported decisions applying it, and from the fair-warning principle that governs criminal law. Under the construction the text supports, the proof fails. The government's own witness agreed that no one was prevented from entering or leaving and that the door the tripod touched was never unlocked. And when a visitor came to the working door, Mr. Reardon stepped out of the way and politely allowed her to enter the building.

The First Amendment supplies independent grounds for reversal. Mr. Reardon was at the courthouse to criticize the officers who guard it, and a reading of "usual use" that turns on the entrance's dignity and on whether a display provokes security personnel gives those same officers unguided discretion over what may be displayed

at the courthouse door. The First Amendment forbids that kind of discretion even in a nonpublic forum, so the expanded construction makes the regulation unconstitutional as applied and on its face.

This Court should reverse the conviction and enter a judgment of acquittal or, in the alternative, vacate the conviction and dismiss the Bill of Information.

## II. Background

### A. The courthouse entrance has five sets of glass doors, and only one is unlocked for the public

The John M. Shaw United States Courthouse faces Lafayette Street. A public sidewalk runs along the street and ends at a row of concrete bollards. Past the bollards is a paved concrete area that leads to steps closed off by metal barricades. Visitors instead use ramps on either side to reach a covered area between a colonnade and the exterior doors, called the portico. Doc. 62 at 2-3. Figure 1 shows the layout.

The exterior entrance "is comprised of five sets of glass double doors and two sets of windows." Doc. 62 at 3. From left to right, there is a set of doors operated only from the inside by a push bar; a set of windows; two sets of doors designated as emergency exits, which the magistrate judge called the EE-1 Door and the EE-2 Door; the main entrance, which he called the Entrance/Exit Door; another set of windows; and a second set of inside-only exit doors. Doc. 62 at 3. Only the Entrance/Exit Door "is customarily left unlocked during business hours for the arrival of visitors." Doc. 62 at 12. The two emergency exits "remain locked," though security personnel can unlock them if needed. Doc. 62 at 3.



Figure 1. The front of the courthouse, showing the sidewalk, bollards, barricaded steps, colonnade, and the doors under the portico. Gov't Ex. 14.

### B. Mr. Reardon's two June visits concerned whether he could record in the unsecured lobby

Mr. Reardon first visited on June 23, 2025, to find out whether he could record in the unsecured parts of the building, relying on the regulation that allows photographs of "[b]uilding entrances, lobbies, foyers, corridors, or auditoriums for news purposes." 41 C.F.R. § 102-74.420(c) (2025); Doc. 62 at 3-4. When Deputy Marshal John Farrish asked his name, Mr. Reardon gave the name Don Matthews. Doc. 62 at 5; Doc. 85 at 174:1-3. Don Matthews is a pseudonym that Mr. Reardon had used before that day. Doc. 85 at 174:4-16. As he explained, "[a]s an investigative journalist, I will, when I'm digging into something or making a request for something, I will a lot of times use the name Don Matthews due to retaliation in the past." Doc. 85 at 174:5-8. He used both names in his later Freedom of Information Act (FOIA)

request to the Marshals Service. Doc. 85 at 174:9-11. The visit ended when Deputy Farrish closed the courthouse about fifteen minutes early and escorted Mr. Reardon out. Doc. 62 at 6.

He returned on June 26, 2025, to file a complaint about Deputy Farrish, who this time addressed him by his real name rather than the pseudonym. That led Mr. Reardon to believe the Marshals Service had begun investigating him. Doc. 62 at 6-7. Neither June visit had anything to do with the exterior doors or the portico.

### C. On August 25, Mr. Reardon livestreamed his protest from the sidewalk until a deputy's gesture drew him to the portico

Mr. Reardon came back on August 25, 2025, after learning through his FOIA request that the Marshals Service had circulated a "be on the lookout" notice, or BOLO, about him and had been in contact with other law enforcement agencies. Doc. 62 at 7. He recorded the entire afternoon. He livestreamed it from a phone on a gimbal and ran a tripod camera that recorded continuously. Doc. 85 at 200:8-201:3, 204:18-22, 211:22-24. His livestream is Defense Exhibit 23. Doc. 84 at 116:24-25. He brought several handwritten foam posters criticizing the Marshals Service.[1]

For nearly half an hour, Mr. Reardon protested by the street, showing his posters to passersby and talking with them about his cause. Doc. 85 at 201:15-202:25,

[1]Three of the posters are in evidence. Gov't Exs. 4-6; Doc. 84 at 94:12-95:24. Government Exhibit 4 reads: "HAPPY NATIONAL F*** THE U.S. MARSHALS DAY! #OperationSilenceThePress." Government Exhibit 5 is a trifold poster whose three panels read, from top to bottom: "F*** The Police," "BACK THE BLUE," and "Until It Happens to YOU!" Government Exhibit 6 reads: "See The Scandal Unfold at www.wtpnews.org AND ON YouTube at WE THE PEOPLE NEWS." The expletives appear in full on the posters; the asterisked form follows the magistrate judge's. Doc. 62 at 8.

205:2-10. Deputy Marshal Hayden Nugent agreed that the sidewalk was a permissible place to protest and that no one from the Marshals Service bothered him there. As he put it, "[n]obody approached him" while he stayed below the steps. Doc. 84 at 94:2-8, 118:20-24. And "[i]f he would have stayed there, he would not have been addressed at all." Doc. 84 at 98:2-3. Figure 2 (below) shows Mr. Reardon at that spot, beyond the barricades. Gov. Ex. 7.



The magistrate judge found that a deputy then made "a gesture from inside the Courthouse that Reardon interpreted as an invitation to enter the Courthouse." Doc. 62 at 7. Deputy Nugent agreed it was "possible" that Mr. Reardon took the gesture as an invitation. Doc. 84 at 96:15-21. Mr. Reardon gathered his things and walked up the ramp to the portico, telling his audience he had been invited in. Doc. 62 at 7. He set the tripod down between two columns and tried the EE-2 and EE-1 Doors and found them locked. Doc. 62 at 7. When a member of the public came to the Entrance/Exit Door at the same moment, Mr. Reardon stepped back, held the door open for her, and said, "After you." Doc. 84 at 121:1-5; Doc. 85 at 207:9-17. Figure 3, a frame from his livestream, shows her going in.




Figure 3. The visitor entering after Mr. Reardon held the door. Def. Ex. 23 at 30:24.

Inside, Deputy Nugent told Mr. Reardon he had not been invited and would be arrested if he filmed inside. Doc. 62 at 8. Mr. Reardon left the building loudly and profanely, but instead of returning to the sidewalk he resumed his protest on the portico, telling his audience "now they just asked for it" and "there's a big part of me that wants to go back in and take the arrest." Doc. 62 at 8. He testified that, as an auditor, he seeks "standing" to challenge conduct he believes is unconstitutional, which he gets by "holding my ground" until he is arrested or threatened with arrest. Doc. 85 at 258:6-16; Doc. 62 at 18-19. He held a 20-by-30-inch poster against or in front of several doors, and while holding it to one of the emergency exits he greeted a visitor with "Happy F*** the U.S. Marshals Day!" Doc. 62 at 8. He also stood "with the posterboard in front of the Entrance/Exit Door for approximately 20 seconds," at one point "propping the poster on the pair of door handles for that set of doors, blocking its use entirely." Doc. 62 at 8; *see* Gov't Ex. 12 at 41:48-42:12. Figure 4 shows

him at the entrance door.







Figure 4 (left). The poster at the Entrance/Exit Door. Gov't Ex. 8.
Figure 5 (right). The tripod outside the locked EE-2 Door. Gov't Ex. 10.

He then moved the tripod and camera "directly in front of the EE-2 Door with at least one of the feet of the tripod touching the door," and he walked to a statue platform at the far end of the landing to keep protesting. Doc. 62 at 8-9. Figure 5 shows the tripod at that door.

About twenty minutes passed, and no one told Mr. Reardon he could not hold posters or a camera to the glass. Doc. 84 at 133:2-7; Doc. 85 at 212:18-213:4. Deputy Nugent then came out, told Mr. Reardon to move the camera, and warned that it would be seized. Doc. 62 at 9. Mr. Reardon refused with a vulgarity. When Deputy Nugent started toward the camera, Mr. Reardon hurried to it, picked it up, and backed several steps away from the door. Doc. 62 at 9; Doc. 84 at 134:3-5, 136:18-25.

When Deputy Nugent told him to take it past the barricades, Mr. Reardon said, "I'm fine right here," and Deputy Nugent arrested him after a three-second countdown. Doc. 62 at 9; Doc. 84 at 137:1-4.

### D. The magistrate judge convicted under a reading of the regulation that first appeared in the Reasons for Judgment

The Bill of Information charged a violation of § 102-74.390, and the government proceeded only under subsection (b). Doc. 3; Doc. 62 at 10. Mr. Reardon moved for a judgment of acquittal and renewed the motion at the close of the evidence. Doc. 84 at 140:17-141:22; Doc. 85 at 271:11-17.

In the Reasons for Judgment, the magistrate judge read "obstructs the usual use of entrances" to reach "an entrance system that has security, safety, and symbolic functions, as well as the purely practical function of allowing visitors to come and go." Doc. 62 at 13. On that construction, he found that Mr. Reardon obstructed the entrance "in three ways": the doors "as doors," the officers' view through the glass, and the entrance "as a dignified transitional space." Doc. 62 at 14.

Mr. Reardon challenged the new construction in a supplemental memorandum, Doc. 64 at 8-11, and the magistrate judge denied the motion to dismiss, holding the portico a nonpublic forum and the regulation, as construed, valid facially and as applied, Doc. 67 at 10-21. Mr. Reardon timely appealed the judgment. Doc. 72; Doc. 73.

## III. Argument

### A. The conviction rests on a construction of "usual use of entrances" that the regulation's text does not bear, and the evidence fails under the construction it does

#### 1. Standard of review

On an appeal under Rule 58(g)(2), the defendant "is not entitled to a trial de novo by a district judge," and "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). This Court therefore "review[s] the magistrate judge's findings of fact for clear error and conclusions of law de novo." *United States v. Hollingsworth*, 783 F.3d 556, 558 (5th Cir. 2015). The meaning of "usual use of entrances," and whether the facts the court found satisfy the correct meaning, are questions of law reviewed de novo. *Id.*

On sufficiency, the question is whether the finding rests on "substantial evidence, i.e., evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant is guilty." *United States v. Smith*, 895 F.3d 410, 415-16 (5th Cir. 2018) (quoting *United States v. Tovar*, 719 F.3d 376, 388 (5th Cir. 2013)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And because the meaning of the regulation is a question of law, a finding made under the wrong construction receives no deference. *See Hollingsworth*, 783 F.3d at 558 (conclusions of law reviewed de novo).

Mr. Reardon preserved these arguments. He moved for a judgment of acquittal

at the close of the government's case on the ground that the government had not proved an obstruction of the usual use of an entrance, arguing that a locked emergency exit had no usual use that day and that "there can be no obstruction of that door." Doc. 84 at 140:17-141:22. He renewed the motion at the close of the evidence. Doc. 85 at 271:11-17. In closing, counsel addressed the entrance door specifically: "you can't obstruct it if you didn't prevent somebody from going through," and Mr. Reardon "moves out of the way and let somebody walk through." Doc. 85 at 298:1-18. Mr. Reardon presses the same grounds here. He answered the post-trial construction in his supplemental memorandum. Doc. 64 at 8-11.

### 2. "Usual use of entrances" means passage, and the provision reaches only physical interference with it

#### a. The text and its neighbors limit the provision to interference with how entrances are actually used

Subsection (b) forbids conduct that "[u]nreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots." 41 C.F.R. § 102-74.390(b). The places on that list share a common feature. Entrances, foyers, lobbies, corridors, elevators, stairways, and parking lots are all spaces that people and vehicles move through. Their "usual use" is passage, and the provision prohibits conduct that unreasonably gets in the way of that use. The Supreme Court has described permissible restrictions at courthouse doors in the same terms, approving a statute that reached picketing that would "obstruct or unreasonably interfere with free ingress or egress to and from" a courthouse. *Grayned v. City of*

*Rockford*, 408 U.S. 104, 112 (1972) (describing *Cameron v. Johnson*, 390 U.S. 611 (1968)).

The decisions applying this provision and its predecessors show what an unreasonable obstruction of usual use looks like. In *United States v. Sachs*, officers escorting a man and a companion out of a federal building told them, after the pair sat down on the elevator floor, that they could not "sit in the elevator blocking it." 679 F.2d 1015, 1016-17 (1st Cir. 1982). The First Circuit held that "[o]bstruction" does not require "complete blocking," and that the "usual use" of an elevator includes carrying government workers as well as the public, so it did not matter that the elevator was on "independent service." *Id.* at 1017. That holding broadened who counts as a user of the elevator, not what using it means; the elevator was carrying people when the defendant sat down in it.

In *United States v. Bader*, seventeen protesters "sat close together in the doorway leading to the draft registration room," so that people coming to register "had to step over them." 698 F.2d 553, 554 (1st Cir. 1983). The court explained that the government "can punish those who physically obstruct a doorway, and make it more difficult for the public to conduct its business." *Id.* at 555. And in *United States v. Gilbert*, a protester lay down in front of the revolving door entrance to the Atlanta federal courthouse, and "[d]ue to his presence at that door, at least two people utilized one of the other entrances." 47 F.3d 1116, 1118 (11th Cir. 1995). The Eleventh Circuit affirmed because his conduct "unreasonably obstructed the path to the courthouse

entrance." *Id.*

Those cases do not require complete blocking. But each involved a working passage that people were actually using, and a defendant who put his body in their path. The elevator was carrying people, the registrants had to climb over the protesters, and courthouse visitors were diverted to other doors. None reached a locked door or treated an entrance's "symbolic" function as part of its "usual use," and in *Sachs* the officers warned the defendant before arresting him. 679 F.2d at 1017. This record differs in each of those respects, as Part III.A.3 shows.

Nothing in those decisions supports reading "usual use of entrances" to protect "security, safety, and symbolic functions," including the use of the doors "as a means for security personnel to observe the building's exterior through the glass" and the entrance's role "as a dignified transitional space that befits the importance of business conducted within." Doc. 62 at 13-14. The Supreme Court has rejected readings of criminal provisions that would "criminalize a broad range of day-to-day activity" and "delegate to prosecutors and juries the inherently legislative task" of deciding what the words cover. *United States v. Kozminski*, 487 U.S. 931, 949 (1988). Whether an entrance has been used in a "dignified" way is a judgment the text does not define and that will vary with the observer. That is the delegation *Kozminski* warned against.

**b. The rule of lenity and the fair-warning principle confirm the narrow reading**

Lenity and fair warning point the same way. Where a criminal provision is

ambiguous, "the doctrine of lenity takes hold," *United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015), so if "usual use of entrances" can reach either physical passage alone or an open-ended set of "symbolic" functions, the narrower reading controls. Due process likewise forbids convicting a person under a construction he could not have anticipated. A criminal provision must give "fair warning" of what it prohibits, and that warning is denied as much by "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language" as by vague text. *Bouie v. City of Columbia*, 378 U.S. 347, 352, 354 (1964). The posted rules repeated subsection (b) word for word and said nothing about locked doors, tripods, sightlines, or symbolic functions. Gov't Ex. 16; Doc. 62 at 17 n.4; *see United States v. Strakoff*, 719 F.2d 1307, 1310 (5th Cir. 1983) (posting must be "reasonably calculated to impart" the prohibition). The first time anyone told Mr. Reardon he was "blocking an entryway" was seconds before his arrest. Doc. 85 at 215:3-13. And the premise for the expanded reading, that courthouse entrances signal "a special, serious, and frequently silent place," came from judicial notice taken for the first time in the written ruling, after the evidence had closed and without notice to the parties. Doc. 62 at 13; *cf.* Fed. R. Evid. 201(e). A conviction cannot rest on an expanded reading announced only after the conduct and the evidence were complete.

### 3. Under the correct construction, the evidence did not prove an unreasonable obstruction of the usual use of any entrance

#### a. The tripod stood against a locked door that had no usual use to obstruct

The tripod rested against the EE-2 Door with one foot touching it. Doc. 62 at 8, 13. But that door was "customarily left locked," Doc. 62 at 12, it was never unlocked that day, Doc. 84 at 137:14-16, and Deputy Nugent agreed that its usual use is not passage by the public or by employees and that no emergency required its use while Mr. Reardon was there, Doc. 84 at 130:2-10. A door that no one may pass through has no usual use of passage to obstruct. The magistrate judge reached the opposite result only by treating the door's potential use in an emergency, and its role in a "security system," as part of its "usual use." Doc. 62 at 12-13.

The emergency-readiness rationale cannot be squared with the word "usual." The magistrate judge reasoned that because an emergency "is by definition a sudden and unforeseen occurrence that requires immediate action," an emergency exit "cannot be impeded at any time." Doc. 62 at 12. Readiness for an event that is by definition unforeseen is the door's exceptional use, not its usual one, and the regulation protects only the "usual use." 41 C.F.R. § 102-74.390(b); *see* Doc. 64 at 9. Reading "usual" to include the unusual reads the word out of the regulation. The record also shows that the door's emergency function was never at risk. The door could be opened only by security staff with keys, who were stationed "feet from that door," Doc. 84 at 126:2-8, 129:21-23, and Mr. Reardon testified that he would

"absolutely" have moved the camera in an emergency, Doc. 85 at 270:15-21.

**b. Holding a poster to the working door for about twenty seconds, with no one shown trying to pass, did not unreasonably obstruct its usual use**

The Entrance/Exit Door was the one door the public could use. The magistrate judge found that Mr. Reardon "stationed himself with the posterboard in front of the Entrance/Exit Door for approximately 20 seconds, at one point propping the poster on the pair of door handles for that set of doors, blocking its use entirely." Doc. 62 at 8. Even taking that finding as written, it does not establish the offense. The regulation does not forbid every obstruction of an entrance. It forbids conduct that "[u]nreasonably obstructs" the entrance's "usual use," 41 C.F.R. § 102-74.390(b), and the word "unreasonably" requires the factfinder to ask how long the obstruction lasted, whether anyone was trying to pass, and whether the person yielded when someone was. In *Sachs*, *Bader*, and *Gilbert*, people were using a working passage, and the defendant put his body in their way. *Gilbert* did not require proof that anyone was actually prevented from entering, 47 F.3d at 1118, but it involved a working entrance and a defendant lying across it. The magistrate judge never asked those questions about the entrance door. Here the obstruction lasted about twenty seconds, no one was prevented from entering or leaving at any point that afternoon, and no one asked Mr. Reardon to move out of the way while he held his poster up. Doc. 84 at 137:5-13. Whether those facts, found under the wrong construction, satisfy the right one is a question of law. *See* Part III.A.1.

The record also shows what Mr. Reardon did when someone actually needed that door. When he first reached the portico, a member of the public walked up to the Entrance/Exit Door at the same moment he did. He moved out of her way, held the door open for her, and said, "After you." Doc. 84 at 121:1-5; Doc. 85 at 207:9-17. Deputy Nugent agreed that Mr. Reardon did not prevent her from going through. Doc. 84 at 121:1-3. The government acknowledged the same thing in closing: "There was a woman that came in he opened the door for. He was very polite to her." Doc. 85 at 283:21-23. Mr. Reardon testified, without contradiction, that he would have done the same for anyone. Doc. 85 at 209:8-12, 270:10-14. That is the conduct of someone using the space alongside the people it serves.

Conduct of this kind is lawful by the magistrate judge's own account. He explained that "[a]n ordinary person would likely read 'unreasonably obstruct' and 'usual use' as a signal that the statute does not prohibit reasonable, temporary obstructions of the entrance incident to the normal business of the building," including "temporarily setting camera equipment near an entrance while waiting for litigants to emerge to be interviewed." Doc. 67 at 18. A poster held to the glass for twenty seconds, with no one shown approaching the door, by a man who had just held that same door open for a visitor, falls within the room the court itself described.

**c. The "doors as doors" finding does not survive the correct construction**

The first of the three theories was that Mr. Reardon "obstructed the use of these doors as doors by placing himself and his camera equipment in front of the

doors for a prolonged period with no apparent purpose other than to provoke a response from security personnel." Doc. 62 at 14. That theory rests on the conduct addressed above, viewed as a whole. The emergency exits were locked for every purpose but an emergency, so a poster held to their glass obstructed nothing but the view through it, which is the sightline theory under another name. The "prolonged period" was the twenty minutes the tripod stood at one of those locked doors, a period the marshals themselves let pass. Doc. 84 at 131:24-133:7. That leaves the twenty seconds at the entrance door. Adding several obstructions of doors no one could use to one brief obstruction of a door no one was shown to be trying to use does not produce an unreasonable obstruction of the usual use of an entrance. And the phrase "no apparent purpose other than to provoke" describes Mr. Reardon's motive, a question the regulation does not ask.

**d. The proper remedy is a judgment of acquittal**

The construction the conviction rests on is wrong as a matter of law, and under the correct construction the evidence is insufficient. The sightline theory and the "dignified transitional space" theory exist only because of the expanded construction, Doc. 62 at 14, and the tripod and poster episodes fail under the correct one. When a conviction is reversed for insufficient evidence, "the only 'just' remedy available for that court is the direction of a judgment of acquittal." *Burks v. United States*, 437 U.S. 1, 18 (1978). This Court should reverse the conviction and enter a judgment of acquittal.

### B. The portico is a public forum, and even if it is not, the regulation as construed and applied to Mr. Reardon is neither reasonable nor viewpoint neutral

#### 1. Standard of review

Constitutional questions, including the application of the First Amendment to undisputed facts, are reviewed de novo. *Hollingsworth*, 783 F.3d at 558; *see Tovar*, 719 F.3d at 384-85. Mr. Reardon preserved the as-applied challenge. He raised it in his motion to dismiss, his reply, and his supplemental memorandum, and at the February 6, 2026 hearing. Doc. 16; Doc. 21; Doc. 64; Doc. 86. The magistrate judge ruled on the merits. Doc. 67 at 10-21.

#### 2. A nonpublic-forum restriction must rest on objective, workable standards and a reason unrelated to the speaker's viewpoint

The portico is a traditional public forum, and the magistrate judge erred in holding otherwise. Doc. 67 at 12-14. It is an open, covered walkway reached by public ramps from the street, where reporters may wait for interviews and the public gathers during festivals, and nothing tells a visitor "that they have entered some special type of enclave." *United States v. Grace*, 461 U.S. 171, 180 (1983); Doc. 67 at 14 n.5; *see Lederman v. United States*, 291 F.3d 36, 42-43 (D.C. Cir. 2002) (rejecting the "special enclave" argument for the Capitol's East Front sidewalk). The magistrate judge's authorities rested on the Supreme Court plaza's marble "architectural integration with the Supreme Court building," *Hodge v. Talkin*, 799 F.3d 1145, 1158-59 (D.C. Cir. 2015), and on a found GSA "policy of excluding demonstrators from the portico area," *United States v. Gilbert*, 920 F.2d 878, 884-85 (11th Cir. 1991). Neither

feature exists here. But the conviction cannot stand even under the nonpublic-forum standard most favorable to the government.

Even in a nonpublic forum, a restriction on speech must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998). Reasonableness is assessed "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985). Two limits on that deference control this case.

First, a nonpublic-forum restriction must supply an objective line. The government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," and where a restriction turns on an open-ended standard, "that discretion must be guided by objective, workable standards." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16, 21 (2018). *Mansky* accepted Minnesota's interest in keeping the polling place "an island of calm," *id.* at 15, and still struck the ban, because a legitimate interest does not excuse a standard officials cannot apply consistently. A gloss that would leave officials to decide case by case is likewise invalid, because it "confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135-36 (1974) (Powell, J., concurring)); *see City of Houston v. Hill*, 482 U.S. 451, 466-67

(1987) (ordinance enforced against those "chosen by the police in their unguided discretion").

Second, reasonableness does not permit viewpoint discrimination. "The existence of reasonable grounds for limiting access to a nonpublic forum" will not "save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811; *see id.* at 806.

**3. As enforced against Mr. Reardon, the regulation satisfies neither requirement**

**a. The marshals decided for themselves when Mr. Reardon's display crossed an undefined line**

As the magistrate judge construed it, the regulation reaches conduct that interferes with the "security, safety, and symbolic functions" of a courthouse entrance and with its role as "a dignified transitional space." Doc. 62 at 13-14. The enforcement here shows what that standard means in practice. The same camera drew no objection while it stood between the columns and became an offense once moved closer. Doc. 62 at 7-9. The marshals photographed Mr. Reardon's poster at the entrance door and his tripod at the emergency exit, said nothing during the twenty minutes the tripod stood at the door, and then decided on their own when the display had gone too far. Doc. 84 at 123:17-124:14, 131:24-133:7. The only objective line this forum supplies, physical interference with people passing through a working entrance, was not crossed. Doc. 84 at 121:1-5, 137:5-9. The open sidewalk a few steps away does not change that. *Hodge* treated an adjacent forum as a point in favor of a

restriction's reasonableness, but an adjacent forum cannot supply the objective line that this construction lacks. *But cf. Hodge*, 799 F.3d at 1169; Doc. 67 at 19-20. And what the marshals were watching included a camera pointed through the glass, an activity the Fifth Circuit has recognized as protected, subject to reasonable time, place, and manner limits. *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *see* Doc. 62 at 8, 13.

A later narrowing does not supply the missing line. In denying the motion to dismiss, the magistrate judge limited the construction to entrances "with established security, safety, and symbolic functions" and "analogous contexts." Doc. 67 at 17 n.7. *Mansky* rejected a similar rescue: "far from clarifying the indeterminate scope" of the provision, the State's narrowing construction "introduces confusing line-drawing problems." 585 U.S. at 18. The same is true here: the court said the regulation permits "temporarily setting camera equipment near an entrance while waiting for litigants to emerge to be interviewed," Doc. 67 at 18, but forbids Mr. Reardon's camera, with the difference resting on the entrance's dignity. And because the general finding of guilt may rest on the sightline and dignity theories, a narrowing announced after conviction cannot save it. *See Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91-92 (1965) (reversing because the conviction may have rested on the ordinance's unconstitutional literal terms).

**b. The construction lets the offense turn on the officers' reaction to the message**

The construction also fails the viewpoint-neutrality requirement as applied,

because it leaves officers free to act on the message. A rule that asks only whether passage was impeded applies the same way to every speaker. One that asks whether a display offends the entrance's dignity, or whether the speaker's purpose was "to provoke a response from security personnel," Doc. 62 at 14, does not, because both questions turn on how officers react to what the speaker is saying and to whom. That risk was concrete here. The marshals knew the speaker and his message before they acted: he had been there twice before, and his posters attacked the Marshals Service by name. Doc. 62 at 3-8. And the magistrate judge's own reasoning treats the same physical conduct differently depending on who is doing it. Reporters who, by a marshal's account, may set up cameras just outside the doors to interview attorneys and litigants are engaged, in the magistrate judge's words, in "the sort of usual obstruction of the entrances incidental to the normal use of the Courthouse." Doc. 67 at 21 n.8; *see* Doc. 67 at 14 n.5. Mr. Reardon's camera at the doors was treated as a crime. A restriction applied that way invites the concern that the speaker is "at least in part, being punished for his political protests." *Huminski v. Corsones*, 396 F.3d 53, 93 n.36 (2d Cir. 2005); *see id.* at 92-93. Reasonable-sounding grounds do not save a restriction that operates as "a facade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.

The regulation as construed and applied to Mr. Reardon violates the First Amendment, and the Court should, in the alternative to Part III.A, reverse the denial of the motion to dismiss, vacate the conviction, and dismiss the Bill of Information.

### C. As construed, the regulation is unconstitutionally vague and overbroad on its face

Before trial, Mr. Reardon's reply said he had not mounted a facial challenge. Doc. 21 at 5-6; Doc. 67 at 1 n.1. Once the Reasons for Judgment announced the new construction, he argued that the regulation, so construed, is facially overbroad, Doc. 64 at 8-11; Doc. 86 at 7:23-8:3, and the magistrate judge treated the motion as raising both vagueness and overbreadth and decided both on the merits, Doc. 67 at 15-18. The defense could not waive a challenge to a construction that did not yet exist, and a claim is preserved where it was "pressed or passed upon below," *United States v. Williams*, 504 U.S. 36, 41 (1992). Both were at least passed upon. Review is de novo. *Hollingsworth*, 783 F.3d at 558. The facial challenge arises only if the Court accepts the construction.

A criminal provision is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Provisions that tie criminal liability to "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" fail that test. *Id.* at 306. A prohibition on interfering with the "symbolic" function of an entrance or its character as a "dignified transitional space," Doc. 62 at 13-14, is that kind of judgment. No visitor can know in advance what displays offend the dignity of a doorway.

The vagueness ruling rested in part on the premise that a facial vagueness

claim succeeds only if the law is vague "in all of its applications." Doc. 67 at 18 (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)). The Supreme Court has rejected that view. Its decisions "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015). Nor was Mr. Reardon's conduct "clearly proscribed" by the text, *Williams*, 553 U.S. at 304; it became proscribed only through the post-trial construction.

A provision is also overbroad when its unconstitutional applications are "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292; *see Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The construction's reach comes from its sightline and dignity theories. Doc. 62 at 14. Under them, a silent protester holding a placard in view of the glass doors, a person whose sign or body partially blocks the officers' view out, and a citizen photographing the entrance for news purposes, which the conduct rules themselves permit, 41 C.F.R. § 102-74.420(c), all commit a crime whenever an officer finds the display undignified. That is the reach *Hill* found substantially overbroad. 482 U.S. at 466-67. The regulation's legitimate sweep, physical obstruction of passage, is untouched by a ruling against the construction, *see id.* at 462 n.11 (explaining that physical obstruction may be punished under a properly tailored statute), so the comparison is between the construction's added reach and nothing.

Forum status, on which the magistrate judge relied, Doc. 67 at 17, does not answer either problem. Subsection (b), as construed, is facially invalid, and the Court should vacate the conviction and dismiss the Bill of Information.

## IV. Conclusion

The Court should reverse the conviction and enter a judgment of acquittal under Part III.A. Alternatively, it should vacate the conviction and dismiss the Bill of Information under Parts III.B and III.C.

RESPECTFULLY SUBMITTED,

CRISTIE GAUTREAUX GIBBENS
Federal Public Defender

BY: ***s/ Dustin C. Talbot***
DUSTIN C. TALBOT
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 3, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

***s/ Dustin C. Talbot***